1

UNITED STATES DISTRICT COURT
STRICT OF WASHINGTON
AT TACOMA



CV 98-05262 #00000098

- - - - - - - - - - - - - - - - - - - - - - - - - -

5

| | |
|---|---|
| KATHLEEN M. HOUSE, | ) Case No.: No.  CV98-5262FDB |
| | ) |
| Plaintiff, | ) PLAINTIFF'S MOTION FOR |
| | ) RECONSIDERATION OF THE ORDER |
| vs | ) GRANTING DEFENDANT'S MOTION FOR |
| | ) SUMMARY JUDGEMENT |
| WASHINGTON STATE DEPARTMENT OF FISH | ) |
| | ) NOTED FOR: |
| AND WILDLIFE AND THE  STATE OF | ) SEPTEMBER 10TH, 2002 |
| | ) |
| WASHINGTON, | ) |
| | ) |
| Defendant | ) |
| | ) |

6

7

8

9

10

11

12

13

14      COMES NOW the plaintiff, Kathleen M. House, and files this motion for

15   reconsideration of the Order Granting Defendant's Motion For Summary

16   Judgement.  This motion is filed pursuant to Civil Rule 07, and is based on

17   the attached affidavit and exhibits, which are offered as further proof of

18   the pretextural nature of the elimination of plaintiff's position and as an

19   example of the  hostile and retaliatory environment in which plaintiff

20   worked.  They is also offered as proof of retaliation, as cited in

21   Ray v. Henderson:

22                    "[4] We have found that a wide array of disadvantageous

23                    changes in the workplace constitute adverse employment

24                    actions  While "mere ostracism" by co-workers does not con-

                       stitute an adverse employment action, see Strother v  Southern

25                    California Permanente Medical Group, 79 F 3d 859, 869 (9th

                       Cir  1996), a lateral transfer does  In Yartzoff v  Thomas, 809

PLAINTIFF'S MOTION FOR RECONSIDERATION    1    KATHLEEN HOUSE, PRO SE

98

F 2d 1371, 1376 (9th Cir 1987), he held that "[t]ransfers of
job duties and undeserved performance ratings, if proven,
would constitute 'adverse employment decisions ' " The
Yartzoff decision was in line with our earlier decision in St
John v Employment Development Dept , 642 F 2d 273, 274
(9th Cir 1981), where we held that a transfer to another job
of the same pay and status may constitute an adverse employ-
ment action "

(Ray v Henderson, 217 F 3d 1234 (9th Cir 2000))

That Penny Cusick, a woman, was involved throughout in the discriminatory and
retaliatory actions, in unfortunately no indication those acts were not based
on sex and on retaliation for opposition to discrimination on the basis of
sex.   Where women have little hope of achieving equality themselves, they are
frequently among those most determined to enforce the inequity they
themselves have endured.  See e.g. Why So Slow?   The Advancement Of Women /
Virginia Valian. MIT Press, 1997; Costa v. Desert Palace:   ("Finally, we
detour briefly to address the suggestion that Hallett was somehow incapable
of discriminating against Costa because Hallett was herself a woman. This
argument was resoundingly rejected by a unanimous Supreme Court in Oncale,
523 U.S. at 80-81. In a society where historically discriminatory attitudes
about women are "firmly rooted in our national consciousness," Frontierb v.
Richardson, 411 U.S. 677, 684 (1973) (plurality opinion), we cannot discount
that the jury perceived Hallett, a former Army officer now placed in a
supervisory position in a virtually male-only world, as demonstrating
hostility toward Costa as a woman as a means of showing that she was "one of
the boys." See also J.E B. v. Alabama ex rel T B., 511 U.S. 127, 136-37
(1994) ("[O]ur nation has had a long and unfortunate history of sex

1   discrimination.   . .") (quoting *Frontiero*, 111 U.S. at 684)." <u>Costa v.</u>

2   <u>Desert Palace</u>,   **99-15645, at 11003 (9th Cir 2002))**

3

4       For these reasons, plaintiff respectfully requests reconsideration of

    the Order Granting Defendant's Motion For Summary Judgement

5

6                                       Dated this 11th day of September, 2002

7

8                                       _Kathleen M. House_
                                            KATHLEEN HOUSE,  PRO SE

9

10

11

12

13                          Statement of Service

14              I certify that I have served a copy of the attached
                Motion for Reconsideration of the Order Granting
15              Defendant's Motion for Summary Judgment, Exhibits and
                Affidavit
16              on defendant's attorney by leaving same at defendant's
                office at 905 Plum Street, SE, Building 3, Olympia,
17              Washington or by mailing same via first-class mail to
                905 Plum Street, SE, Building 3, P.O. Box 40145,
18              Olympia, Washington  98504-0145 on September 11, 2002

19

20              _Kathleen M. House_

21              Kathleen M. House

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

FILED
LODGED
RECEIVED

SEP 11 2002

CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

| | |
|---|---|
| KATHLEEN M. HOUSE, | ) Case No.  No.  CV98-5262FDB |
| | ) |
| Plaintiff, | ) AFFIDAVIT IN SUPPORT OF PLAINTIFF'S |
| | ) MOTION FOR RECONSIDERATION OF ORDER |
| vs. | ) GRANTING DISMISSAL ON SUMMARY |
| | ) JUDGMENT |
| WASHINGTON STATE DEPARTMENT OF FISH | ) |
| | ) |
| AND WILDLIFE AND THE  STATE OF | ) |
| | ) |
| WASHINGTON, | ) |
| | ) |
| Defendant | ) |
| | ) |

THIS INSTRUMENT HEREBY ACKNOWLEDGES that the undersigned, Kathleen M. House,
is of legal age, and does hereby swear and affirm that the following is true
and accurate, to the best of her knowledge, under penalty of perjury:

That I am the plaintiff in the above-named case and make this affidavit
in support of the Attached Motion For Reconsideration Of The Order Granting
Defendant's Motion For Summary Judgement.

This affidavit is offered in support of the fact that there existed a
long-standing pattern of retaliation by management within Fish and Wildlife,
beginning in 1994 and continuing up to and following the elimination of my
position by the department.  Retaliation began as early as 1994, when I first
sought redress for the reduction of the position for which I had been hired
from a highly skilled technical position to essentially a support position.

1   The following facts illustrate one such pattern, in which Ms. Cusick used the
2   eleven month delay in scheduling the Personnel Appeals Board hearing to
3   fabricate evidence, and in which evidence of Ms. Cusick's use of her position
4   as personnel officer to support Mr. Owen's and Mr. Ferguson's false
5   allegations is particularly clear:

6   After I had contacted Ms. Cusick, then a personnel officer 3 with the
7   department, about the fact that Mr. Owens continued to deny me the work
8   specified in the job description under which I had been hired, Mr. Owens
9   wrote an untimely performance evaluation that inaccurately described the work
10  I had done and contained statements about my actions which he knew to be
11  false.  As part of his attacks on my character and personality in that
12  evalatuion, Mr. Owens falsely stated that I had engaged in prolonged agitated
13  discussion with Howard Ferguson, the biologist 3 to whom a large portion of
14  my original duties had been transferred by Mr. Owens, and that I had accused
15  Mr. Ferguson of trying to steal my job.  I stated in the employee remarks
16  section that I had not done this, and further stated:  "Mr. Ferguson did come
17  to my cubicle to discuss another question, and in the course of a
18  conversation audible to Mr. Owens and others, became aggressive and
19  confrontative.  He raised his voice, came quite close to me and said that he
20  was not trying to steal my job and that I was accusing him of this.  He
21  repeated this several times.  Prehaps this is the conversation Mr. Owens is
22  referring to.  I remained calm, and a level tone of voice, replied that I was
23  not accusing him of trying to steal my job but that tasks that were
24  originally mine continued to be assigned to him and that this did concern me.
25  I suggested that he, myself and my supervisor discuss this issue. He became
    calmer and asked me if I wanted to go outside the building to continue the

1

2     discussion.  We did continue the discussion outside.  My supervisor, who was
      within hearing range, did not intervene at any time."  Mr. Ferguson discussed
3
      my lack of appropriate assignments during the subsequent conversation
4
      sympathetically and said that he understood my concerns and that he would not
5
      repeat the conversation to Mr. Owens.  He then reported the conversation with
6
      me outside the building to his supervisor, Jim Rieck, who then reported it to
7
      Mr  Owens.   Mr  Ferguson later told me Mr  Owens had repeated to him the
8
      facts I had written in the evaluation rebuttal concerning the above incident.
9
      Mr. Ferguson also stated that he was extremely angry that I had written this.
10
      He began a pattern of becoming quite suddenly and causelessly confrontational
11
      and angry with me, then apparently reporting to others, who did not discuss
12
      his accusations with me, that it was I who had done this to him.  According
13
      to testimony given by Ms. Cusick at the evaluation appeal hearing a year
14
      after the evaluation was written, he went to her several times to complain
15
      that I had blown up at him.  Ms. Cusick gave conflicting testimony concerning
16
      the timing of Mr. Ferguson's accusations, but did consistently admit that she
17
      had never discussed them with me.  Ms. Cusick's testimony during the
18
      evaluation appeal hearing is as follows
19
      Stewart Johnston:  Uh you've heard testimony today regarding Ms. House belief
20
      that there are inaccurate statements in the evaluation.  Do you recall um and
21
      I'd like to ask you specifically about a comment that's contained on the
22    first see it'd be page four of exhibit A2 of the third paragraph a comment by
23    Mr. Owen and I'm quoting upon hearing of this you engaged in a prolonged
24    agitated discussion with Mr. Ferguson wherein you accused him of trying to
25    steal your job.  Do you see that?
      Penny Cusick:  Yes.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stewart Johnston:  Uh do you recall that issue being discussed at any time?

Penny Cusick:  Uh I recall it being discussed during the meeting.  I also went to Mr. Ferguson and asked him

SJ:  Uh you can go ahead and answer.  You were you were testifying I believe at the time of the objection that you had contacted Mr. Ferguson?

[following an objection by my representative, Ray Greeley]

SJ.  Uh you can go ahead and answer   You were you were testifying I believe at the time of the objection that you had contacted Mr. Ferguson?

PC:  Right   I spoke with Mr. Ferguson um about this incident and what he said is Kathleen blew up at me, she was yelling at me and accused me of trying to steal her job again.

SJ:  With respect to when when this conversation occurred uh uh in fact what led you to contact Mr. Ferguson on this subject?

PC:  Actually, Mr. Ferguson had contacted me earlier about the incident and after reading through this I back to Mr. Ferguson and asked him if this was the incident that he had contacted me about earlier?

SJ:  Uh did this incident that you describe take place within the time frames of the evaluation covered by the evaluation?

PC:  I don't know.

On cross-examination by Ray Greeley, Ms. Cusick changed her testimony:

RG:  Uh I have I have a couple.  I believe you indicated that you don't remember when Mr. Ferguson contacted you?

PC:  Right.

RG:  So you don't you're it's not your testimony that he contacted you with a complaint that occurred during this evaluation period.

PC:  It was several months before um Kathleen contacted me which would have been early spring.  I I think we first started talking in in February or

1   March or April

2   KH:   January

3   PC:   January?  Very early spring uh and it was several months before that

4   that her coworker had come

5       In a deposition taken on October 22, 1998, Ms. Cusick testified that

6   she had never discussed Mr. Ferguson's allegations with me, and further

7   agreed that the event to which she refers to above took place in 1995, not

8   during the evaluation period prior to September, 1994:

9   Q   The previous incident that I had asked you about, in that particular

10  case, and it was the reference—the memo that I showed you, there was a

11  specific incident and it is—it's not the only one of its kind, but it is a

12  specific incident where Howard Ferguson went to you and complained about

13  behavior on my part?

14  A:   Absolutely.

15  Q   And I know that this was never discussed with me.

16  A.   Right. At Howard's request, as I would do with you if you complained

17  about Howard.

18  Q.   It was, however, reported as an indication of my personnel problems; in

19  other words, it was reported as true by yourself in an inquiry by the

20  personnel board.  So apparently the truth of the incident—

21  A:   The truth of the incident was that Howard had come to me to complain, and

22  that's what was reported.  That is true.

23  Q.   But you did take that complaint outside the context of the personnel

24  office.  It was used as an incident.

25  A.   The incident that was reported to me was that Howard had come to me and

complained.

PLAINTIFF'S AFFIDAVIT     - 5                    KATHLEEN HOUSE, PRO SE

1 Q. Right. But it was not—there was no investigation further?

2 A Well, I didn't have to investigate whether or not Howard had come to me

3 to complain because Howard came to me -

4 Q. I see.

5 A. - to complain. And that's what was reported

6   In a deposition taken on September 11, 1998, Ms  Cusick directly

7 contradicted the August, 1994 appeals board testimony stating that Howard

8 Ferguson had complained to her about me prior to my first contacting her in

9 Janary of 1994 concerning my job assignments and and testified that no one

10 had:

11

12 Q. [] Was my name familiar to you when I called? Do you remember -  do you

13 have any sense that you had already heard the name when I first called you or

14 that, you know, was it just like who is this calling me?

15 A. I knew who you were because you had been a new hire and had had

16 discussions with the Personnel Office before you had moved to the State, so I

17 knew who your name was. And being a small agency, we in the Personnel Office

18 probably knew most names of people in the agency, so no, your name was not a

19 surprise.

20 Q. Did you have any other connotations with the name? Did you have any

21 other associations with it when I first called?

22 A. No, other than that you were working in the computer arena and that you

23 were a fairly new hire.

24 Q. So you - you didn't know at that time whether I called anyone else

25 Personnel about the same issue -

 A. No.

1
Q. -to resolve some problems?

2
A.   No.

3
Q. So given that, it seems that no one else would have mentioned me to you as

4
being a problem or being -  or having had problems with me before I first

5
called about the task assignments?

6
A.   I don't believe that anyone had talked me about a problem, no.

7
     .

8
     The personnel evaluation hearing and subsequent depositions also

9
illustrate how Ms. Cusick, aided by Stuart Johnston, used her function as a

10
personnel officer to lay a false foundation for Mr. Owens' allegation that I

11
had characterized the August 1993 permit drawing run as "janitorial".  When

12
Ms. Cusisk, Mr  Owens and myself met in May of 1993 to discuss the skill

13
level of my actual assignments in contrast to those listed on my CQ, Mr.

14
Owens attempted to persuade Ms. Cusick that such routine tasks as running

15
existing JCL to print datasets for him, tracking down and bringing back the

16
printouts to him, cleaning up users' libraries on the IBM and writing system

17
documentation for a coworker's use were highly skilled tasks, equivalent to

18
the database creation, application design and SAS programming that had been

19
listed on my CQ.  Because Ms. Cusick said she knew nothing about computers

20
and continued to appear not to understand the very low level of skill

21
required by the tasks Mr. Owens described, and because of the friendly nature

22
of that first meeting, I used the term janitorial to try to bring home to Ms

23
Cusick the nature of these tasks   Neither Mr. Owens nor Ms. Cusick took

24
exception to my describing the tasks in this way at that time.  Mr. Owens

25
combined this with one of the few errors I had made during my first six

PLAINTIFF'S AFFIDAVIT     - 7                    KATHLEEN HOUSE, PRO SE

1   months at Fish and Wildlife to falsely alleged in my performance evaluation
2   that I had described the August 93 permit drawing run in this manner and went
3   on to reverse the positive manner in which he had first evaluated that work.
4   In that run, three separate errors required the permit drawing to be rerun·
5   Jim Rieck, who had run the series of jobstreams for the drawings for years,
6   forgot to run the one to apply tag numbers to applicants' records,  the data
7   entry staff misplaced 400 applications that were omitted from the run; and I
8   encountered for the first time an error generated by the site-specific,
9   unexpectedly small space allocated for on-line SAS sorting by the Department
10  of Information Services, as well as the fact that that on-line SAS routine
11  gave a false message that datasets were recovered if an abnormal job
12  termination occurred.  In contrast to Mr. Owens' comments on the evaluation,
13  I had backed up the dataset for which the job failed; my sole error, also
14  committed by Mr. Rieck, was in mistaking the record count because of two
15  transposed last digits and failing to note that records were missing before
16  the permit drawing was run.  This occurred at the end of a 9-hour day, during
17  which the interface program to the IBM went down many times, and during
18  which entire time Mr. Rieck had insisted that he sit with me at the computer
19  terminal in my cubicle, tell me which individual records to records to go,
20  what fields to change, what keystrokes to enter and what corrections to make
21  for every mistype I made immediately on its occurrence. He had refused to
22  provide a written list of the changes to be made to the records, such as Mary
23  Ellen Bradley had required before making these dataset changes via an update
24  program the year before, and would not allow use the update program in that
25  run.  Mr. Owens knew all this at the time the evaluation was written because
    he had required at the time of the incident that I give him a written report

PLAINTIFF'S AFFIDAVIT   - 8              KATHLEEN HOUSE. PRO SE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

of the incident and that information was in the memo   He also knew that I

had backed up the dataset because the backup of the dataset was the one used

in the drawing rerun that he himself ran. Neither Jim Rieck nor data entry

personnel were never asked to record their errors nor did Tom Owens ask them

to.   I had written several new programs for that drawing run, solved a long

standing error in the birthday checking program Mary Ellen Bradley had

written and solved the terminal emulator problem entirely on my own by

locating 3270 terminals across two streets from our office in Lacey and

getting permission from the Department of Information Services to use them.

Mr. Owens acknowledged the satisfactory nature of this work in my first

evaluation, then combined the one oversight I had committed with a word taken

completely out of context six months later to revaluate the entire period.

Because I did not believe he would be allowed to leave this in the

evaluation, I did not answer this in detail in my response, which was as

follows:

"Accomplishment of job requirements  [ ] Concerning last August's
permit drawings:  again, this was discussed in my previous evaluation and the
only mention of it was a commendation for my bringing the problem promptly to
my supervisor's attention.  Again, if this is allowed to remain, I will go
into greater detail on this.  I will say that the representation of the
problem in this evaluation is inaccurate: my supervisor has a copy of the
attached memo, written at his request at the time of the incident.  It
clearly states that the dataset was back up at the time and a restore done".

The work I done that actually was covered by the second evaluation period

included writing the first Unix online command scripts to read and process

SAS datasets, the first Unix SED scripts to translate PRIME file designations

to Unix format, the first production Paradox desktop application, which was

delivered on time and to specifications, recreating the entire PRIME

PLAINTIFF'S AFFIDAVIT     - 9                    KATHLEEN HOUSE. PRO SE

1   directory structure on the new Unix platform and accurately translating and

2   transferring hundreds of SAS datasets to Unix from the PRIME computer.   Mr.

3   Owens evaluated all of this with the single sentence. "In general, the

4   quantity, timeliness, quality and accuracy of work completed has been

5   satisfactory."

6   Ms Cusick's false testimony during the hearing served two purposes for Mr.

7   Owens:  she appeared to corroborate his misapplication of my use of the term

8   "janitorial" and she helped Mr. Johnston falsely backdate the beginning of

9   the evaluation process.  The following is testimony from the performance

10  evaluation hearing:

11  RG    You heard Ms. House testify that she had contacted you uh and had met

12  with you and had had meetings with Mr. Owens and you before uh what she

13  contends was the July 21st date where the process began and that those

14  meetings the na that the purpose of those meetings was to discuss concerns

15  she had about job assignments about working within classifications um

16  etcetera  It

17  PC:   We did have a meeting on May 19th to discuss those issues, yes.

18  RG·   Okay.  That was the purpose of the meeting on May 19th?

19  PC:   The purpose of the meeting on May 19th was what I've just described to
    you.

20  RG:   To discuss those issues.

21  PC·   To discuss those issues as the beginning of her performance evaluation

22  process, yes.

23  RG    Okay.

24  BD:   Any other questions of this witness?  Any board members have any
    questions?  Thank you very much.  You're excused.

25  RG:   Appellant rests

PLAINTIFF'S AFFIDAVIT      - 10                    KATHLEEN HOUSE, PRO SE

1  BD:  Are we ready for closing

2  RG.  I'd like to put Ms. House back on the stand for one or two uh clarifying

3  questions, and then I'll be prepared to go to closing.

4  BD:  Alright.

   BD   Ah we remind you you're still under oath    Please be seated.
5
   KH:  Okay.
6
   RG:  Ms. House, with regard to the May 12th meeting, uh were you ever informed
7
   that that meeting was intended to be a discussion with regard to your
8
   performance evaluation?

9  KH:  No, I was not.

10 RG·  Thank you.  Is it your understanding the meeting was set up specifically

11 as a result of your concerns and your request to have someone intervene to uh

12 to attempt to come to a clarification as to what your job assignments should

   be?
13
   KH:  It was.  Uh it was set up specifically because I had met with Tom Owens
14
   about my job assignments and had been unable to resolve it.   The meeting was
15
   set up at Ms. Cusick's instigation

16 RG:  It was set up what

17 KH:  at Ms. Cusick's instigation but not at that time to begin the evaluation

18 process.

19 RG:  Okay.  Was there any sharing of of performance documents or discussion

20 of performance evaluation documents at that time?

   KH:  No, there was not.
21
   RG:  Thank you   I have nothing
22

23 Mr. Johnston then used this misrepresentation by Mr. Owens and

24 fabrication by Ms. Cusick in his concluding testimony to the Board:

25
   BD:  Thank you, Mr. Greeley.  Mr. Johnston?

1   SJ:   Thank you. Ah looking at the notice of appeal that Ms. House provided
2   to the board filed with the board, uh it appears there are three remaining
3   issues that are being addressed here. The first has to do with the time
4   period and whether or not the time period covered by this evaluation is uh
    constitutes a violation of the rule. Ah WAC 356-30-300 does call for
5   evaluation to be conducted during probationary or trial and we know that the
6   first evaluation was a result followed upon the heels of the probationary
7   period   The uh annual evaluation was as we've heard through the testimony of
8   both Ms. House and Ms. Cusick was ah the process was in place on or about Ms.
9   House anniversary date which was March 15, although it wasn't completed until
10  September, uh so it does although it doesn't uh precisely fit the annual
11  requirement it does cover a period that is within the spirit of the rule and
12  should therefore not be stricken on that basis. There's a third claim or the
    second claim that's before the board that remains before the board has to do
13  with the events and circumstances outside the evaluation period I believe
14  that primarily focuses on uh one performance dimension which accomplishment
15  of job requirements un included comments uh by Mr. Owen that covered time
16  periods that were covered in a prior evaluation. And we've heard Ms. Cusick
17  characterize those and explain why they were there uh when you look at the
18  text and again this would be the fourth page of the uh A2 it appears as
19  though paragraphs one and two were included to ah express concern by the
20  supervisor with respect to Ms. House's characterization of the work that was
21  uh performed in August, that is August of uh 93, as being janitorial, and
    those comments uh if we look at the remarks in Mr. Owens evaluation the
22  comments were made during the meeting during the meeting with Ms. Cusick and
23  uh this obviously caused concern by the supervisor because she Ms. Ms House
24  was dismissing the assignments as being janitorial. So the comments were
25  made characterizing work that was done outside the evaluation period but they
    reflected her state of mind during the meeting with Ms. Cusick in an effort

1    to carry out the evaluation for this time period of uh October to uh to June
2    of ninety uh four and it does reflect a state of mind that I think
3    appropriately does need to be addressed by the supervisor. Uh that would
4    cover the first two paragraphs of accomplishment of job requirements.
5    Technically, yes, they do address performance that occurred outside the time
6    frames, but it appears when you look at the text that he was quite concerned
7    Mr. Owens was quite concerned as Ms. House characterization characterization
8    occurred within the time frames of the evaluation at least during the
9    meetings um to discuss the evaluation. So its clear as to why they're there.
     We get into an area and I'd like to talk about the last issue before the
10   board and that has to do with the allegation that the evaluation contains
11   numerous blatantly false statements. Ah evaluations always by necessity
12   contain characterization adjectives uh it is clear that there's quite a bit
13   of concern by the appellant here with respect to the use of the choice of the
14   supervisor to use the word conspiracy uh because of what that implies.   The
15   supervisor obviously used that word to best characterize his belief that she
16   Ms  House felt that there were others that worked in her work group who were
17   working together in some way or another to deny her information.  Obviously,
     the supervisor felt that that belief by Ms. House was not accurate and that
18   she was unnecess she was that this concern on her part that people were
19   against her was somehow impacting her work and the work of the group   As a
20   supervisor he has an obligation to bring that concern to her attention.
21   That's what the evaluation process was designed to accomplish. I think this
22   board has has heard and seen enough situations involving conflicts between
23   supervisors and their subordinates to understand the the problem here.  There
24   is a the supervisor sees things one way, the employee sees it another, the
25   supervisor has an obligation to be honest and candid and explain to the
     employee during the evaluation process exactly where that employee stands.

PLAINTIFF'S AFFIDAVIT    - 13                    KATHLEEN HOUSE, PRO SE

1    It would be a disservice to the employee to to pretend that there weren't
2    problems if in fact in the supervisor's mind there are.  And that necessarily
3    involves use of terms such as in this case it's a strong term a conspiracy a
4    belief in a conspiracy   It could be a use the use of a term say an
5    employee's unnecessarily rigid or doesn't follow instructions well or any
     number of potentially negative characterizations.   The relief that Ms. House
6    is asking the board to grant is essentially to change words in an evaluation
7    to take words out of the supervisor's mouth by claiming that they're
8    dishonest.  Well, I don't think they're dishonest comments or false comments,
9    they're a true representation of how the supervisor sees Ms. House    If the
10   board ends up granting relief here, I can't imagine any evaluation that would
11   not be before the board.  Somebody might say, I'm not rigid, I'm not uh
12   easily uh upset by everyday work problems, I resent that, that's false, I'm
13   going to go to the board and appeal it.  And then the employee can come
     before the board and say I want that bad word and it could be any number of
14   adjectives that that we see often in evaluations and ask for it to be
15   removed.  So I think there is to some extent a a slippery slope here if the
16   board ends up um coming in and uh ruling on the proper choice of words that a
17   supervisor might include in an evaluation.  And I'd strongly urge the board
18   to decline that opportunity and and refrain from from such activity.  With
19   respect to the process, I think the process was followed and that board
20   should limit itself in looking at the process to make sure that the process
21   was fair.  But getting down into second guessing the use of certain
22   adjectives is beyond the purview of this board and I think properly so.  And
     for those reasons respondent asks the board to dismiss this appeal.
23   BD:  Alright.  Any board members have any final comments?  Okay, this hearing
24   will be closed    The board will issue its decision within the statutory time
25   lines.  Thank you very much for your opinions here today.  The hearing's
     closed.

1

2          The following are my notes, taken at the time of the incident in 1995,

3     that describe the incident that Mr Ferguson allegedly reported to Ms.

4     Cusick, to which Ms. Cusick testified at the evaluation appeals hearing

5     supposedly covering events occurring in 1995, and referred to in the memo to

6     Mr. Brittell attached to Ms. Cusick's deposition:

7          "04/13  Asked HLF if he had the Salcedo book, he said he did but it was
           at home, and he could bring it Monday. He then almost immediately
           said "Why are you acting funny" in an accusitory tone - I asked how was
8          I acting funny, then said I was not acting funny, - this is too tedious
           to track in detail - essentially, HLF accused me of "acting funny"
9          about his having the book, I said it was okay, but JMR had said he had
           ordered it some time ago, he said in an increasingly heated tone of
10         voice that he'd only had it since the previous Wednesday, and could get
           it back on Monday, I kept saying that it was okay, and trying to end
11         the discussion. He came by a few minutes later, asked to have a "chat"
           in the conference room, and proceeded in a very raised tone of voice,
12         to say he objected to the way I had asked him about the book.  I
           started to apologise, then said no, I had done nothing wrong, I had
13         only said I would buy the book myself, since he had his copy at home,
           he continued, in a loud voice, to complain about my saying he had
14         resourses I did not   Ended by people needing the conference room.  I
           went downstairs for about 45 minutes to read up on TCursors.  JMR came
15         by after I returned, said to go to the conference room, said "You had a
           blow up with Howard". I asked if that was what Howard had called it,
16         JMR said "I heard it". Said this is the sort of behaviour that has to
           change, that its a behaviour problem that has to be dealt with.  Said
17         "when you go after someone like that, and you're accusitory, they're
           expected to react in a negative fashion".  I said I had not been
18         accusitory; asked what specific behaviour he had asked about - he said
           no, I'm not going to jump through your hoops. Also said, its what puts
19         people off and makes them not want to deal with you.

20

21    The following is the description I gave of this incident under the heading

22    "Administrative personnel's response to request to rectify the equipment and

23    technical access problems" in the form Sandra Turner required that I complete

24    in 1996 as part of the her internal Title VII investigation·

25         "Within a month after the meeting described above, Jim Rieck told me
           that Howard Ferguson had had a manual for at least a week that I had
           been trying to order for over a year, and that would have been of great

1     help in using Paradox, as I did not have access to a usable on-line
help system, as Howard Ferguson and Randy Kreuziger had. On April 13, I
2     asked Howard Ferguson for this manual. He said he had taken it home,
and then immediately began to accuse me of "acting funny". I kept
3     trying to end the discussion, but he continued to accuse me in an
increasingly heated manner of acting funny. He came by my cube a few
4     minutes after the conversation ended and asked to have a "chat" in the
conference room. He then yelled at me in the conference room for 15
5     minutes about the way I had asked for the book. Jim Rieck came by
later that afternoon and told me to go to the conference room. He said
6     that I had had a "blow-up" with Howard, and castigated me for causing
problems with other people. I asked him what behavior he specifically
7     meant, and he said "No, I'm not going to jump through your hoops". I
later asked during a performance evaluation conference if he had heard
8     what I had actually said, and he said he hadn't, but he didn't need to.

9     Since this incident was later used by a DFW personnel officer
representing my first supervisor at an appeals hearing, I tried to have
10    the situation reviewed by less partisan DFW administrative personnel
before Howard Ferguson transferred to Spokane. I met with Dave
11    Brittell on August 25th, 1995 at 1:30, to try to have Howard Ferguson
held accountable for the accusations he had made. I told Dave
12    Brittell that Penny Cusick had repeated under oath Howard's accusations
against me, and that it was important that this be brought to light.
13    Dave Brittell did not think this necessary    I bought, with my own
private funds a copy of the book Howard Ferguson had taken home with
14    him, as I had needed it for over a year."

15

16   The actions of Tom Owens, Penny Cusick, Howard Ferguson, Jim Rieck, Dave

17   Brittell and Stuart Johnston in these interratted occurrences are an example

18   of the hostile retaliatory environment in which I continued to work following

19   my first efforts to bring my job assignments, training, equipment, and

20   technical access into parity with my male coworkers. Mr. Brittell and Ms.

21   Cusick culminated these actions, which included making my CAP 3 position

22   redundant by transferring my job duties to Mr. Ferguson and Mr. Kreuziger,

23   changing Mr. Ferguson's vacant position to a CAP 4 based on the transferred

24   duties, denying the training specified by Mr. Rieck as part of my job in 1995

25   and made a selective for the CAP 4 position, refusing to allow me to fill the

       CAP 4 position, hiring Marvin Young, a male from outside the agency as the

1   CAP 4 a year after the position became vacant, and then eliminating my

2   position based on the fact that I had not been promoted, that Marvin Young

3   just happened to have seniority as a state employee, and that Randy Kreuziger

4   had been hired six months before myself.    Ms. Cusick testified during the

5   RIF appeal hearing in 1998, that no matter what job duties were scheduled to

6   be eliminated, my position would be the one to be cut    Karen Dickerson, a

7   subordinate of Ms. Cusick's, testified during a deposition taken in 1998,

8   that Ms   Cusick had told her that she do anything to support agency

9   management in order to keep her benefits and health insurance.  I could not

10  afford to have that deposition transcribed.

11

12

13                                  Dated this 10th day of September, 2002

14                                       KATHLEEN HOUSE, PRO SE

15

16

17

18

19

20

21

22

23

24

25

```
 1   Ready.
 2   Yes we are.
 3   BD:  This is a hearing before the personnel appeals board.  We're
 4   meeting on August the 3rd, nineteen hundred ninety five.  Personnel
 5   Appeals Board hearing room, at 2828 Capitol Boulevard, Olympia,
 6   Washington.  Present are all 3 board members:  Vice-chairperson Nora
 7   Reynolds [NR], Member Art Wong [AW] and Chairperson Charles ? [BC].
 8   Board is convened to hear case no. V94-078, Kathleen House versus
 9   Department of Fish and Wildlife.  For the record could we have
10   identification of the parties present, beginning with the appellant
11   please.
12
13   Ray Greeley [RG]:  I'm Ray Greeley, with the Washington Federation of
14   State Employees, representing the appellant, Kathleen House [KH], who
15   is seated to my right.
16
17   Board Chair [BC]: And for the respondent?
18   Stewart Johnston (SJ): I'm Stewart Johnston, Assistant Attorney
19   General, representing the department of Fish and Wildlife.  To my left
20   is Penny Cusick, personnel officer for the department, and to Ms.
21   Cusick's left is Donna Stanbaugh, Assistant Attorney General, who is
22   here, uh, observing.
23
24   BC:  I believe this is a rule violation appeal.  Appeal was received at
25   our personnel appeals board hearing office on October 11th, nineteen
26   hundred ninety four.  Alleged rule violation slash 356-30-300 uh its
27   the rule violations one.  Are there any preliminary matters as far as
28   exhibits and so forth by either party?
29
30   RG:  I have submitted uh five exhibits that have been marked
31   appellant's one
32   through five that uh Mr. Johnston has indicated the willingness to
33   stipulate to. It would be appropriate at this time to identify them for
34   the record
35
36   BD:  Please do so.
37
38   RG:  Appellant's exhibit 1 is uh three page document that is the uh a
39   copy of the appeal form and it's attachment that was filed in this
40   matter.  Appellant's exhibit 2 is a multi-page document that is the
41   evaluation that is being contested.  Appellant's exhibit 3 is a 3 page
42   uh excuse me 4 page document that is the um the evaluation of Kathleen
43   House for the period of 3/15/93 to it looks like 7 or 9/15/93 and the
44   copy's cut off a little bit.  Uh there's a November 29 1993 personnel
45   date stamp in the center of the first page. Appellant's exhibit 4 is
46   merely a copy of the instruction page of
47
48   AW:  Let me sorry let me go back to A3 here uh the dates at the top are
49   cut off so that this kind of where it's I can't read uh the blank 15
50   that's from
51   you're saying that's March 15th, 93?
52
53   RG:  March 15th, 93.
54
55   AW:  And then if it say 10/18/93 on mine but it looks like there's a
56   slash through it is that
57
```

1  RG. Yes, that's been crossed out and there's been another date written
2  in that I'm not sure that I can read.
3
4  AW: Okay.
5
6  RG: As well, but I'll identify it as the most recent performance
7  evaluation before the one in question. The appellant's exhibit 4 is the
8  instruction page from the uh Department of Personnel's State of
9  Washington employee performance forms.  Uh Appellant's exhibit 5 is
10  merely a copy of WAC 3563300 which is the rule that we're alleg
11  alleging has been violated in this case.  I would move for admission
12
13  BD:  Mr. Johnston?
14
15  SJ:  No Objection
16
17  BD:  Appellant's A1 through A5 inclusive, they will be admitted.
18
19  RG·  Is that a copy there?
20
21  AW:  Oh, you did?
22
23  RG:  Right there, yes.
24
25  AW:  Right in from me. Thank you.
26
27  BD:  As exhibits?
28
29  SJ:  Uh, yes. Respondent offers two exhibits, I believe the copies have
30  been provided, these exhibits um are single page documents that are
31  copies of communications to the appellant from her supervisor that
32  pertain to the evaluation.  Um R1 is is a letter from Tom Owens, the
33  supervisor, to Ms. House, dated September 12, 94 and R2 is a letter to
34  Ms  House from Jim Eby, E-B-Y, dated September 15, 1994.  Uh, we're
35  asking that the board consider those and admit those, I don't know if
36  Mr. Greeley
37
38  RG:  No objection
39
40  BD:  Alright. Respondents R1 and R2 are stipulated to and admitted.
41  Are there any other preliminary matters?
42
43  SJ:  I should alert that the board and appellant with respect to one of
44  the issues uh the issue having to do with timeliness um as I'm sure the
45  Board is aware and Mr. Greeley is aware there are cases on that address
46  the issue of timeless in personnel or performance evaluations and the
47  appropriate remedy to be uh decided by the board in the event that is
48  not uh completed within the sixty days as required by the merit system
49  rule.  I um would cite to the board some cases uh stemming uh it from
50  1988 um there's a Sullivan, Murphy and Delang vs. Department of
51  Transportation ah V88-039, 040 and 041.  These were consolidated in
52  that case the issue before the board had to do with whether or not an
53  evaluation that was not completed within the sixty days should be
54  destroyed.  The Board reaffirmed conclusions expressed in prior
55  opinions and held that uh the MSR-356-30-300 which requires evaluations
56  to be completed within sixty days is a guideline and is directory, not
57  mandatory. Uh, it's that same analysis is contained in Horton v. DSHS,

```
 1  V88-047 which was also decided in November of 1988, I think on the same
 2  day.  Since that time there's been uh our division 2 of our court of
 3  appeals has addressed the issue in Sullivan vs. Department of
 4  Transportation, 71 Washington Appellate 317 uh its 1993 decision uh and
 5  the issue before the uh before the court of appeals uh was the same as
 6  as the issue ah presented here at least in part in Ms. House's appeal
 7  which was whether or not evaluations should be destroyed if they're not
 8  completed within sixty days and the court of appeals held that the
 9  sixty day time limit under the WAC 356-30-300 is directory not
10  mandatory and therefore the PAB decision that was on appeal was upheld
11  and so we're going to be relying in support of a motion to dismiss the
12  uh the claim uh before this board today with respect to the timeliness
13  of the evaluation.  Um I should point out that the court of appeals did
14  recognize that in certain circumstances the removal of an untimely
15  evaluation from an employee's file might be appropriate and uh the
16  board and this board has expressed and this view has been endorsed by
17  the court of appeals that the board will consider voiding an evaluation
18  when delay quote casts doubt upon the value and credibility of the
19  evaluation so I'd suggest to the board and that in that's it's uh in
20  line with what's this board's previously decided.  That would be the
21  issue with respect to timeliness: did in fact the delay in the
22  evaluation here uh cast doubt upon the value and credibility of the
23  evaluation.
24
25  BD    Um I'm trying to uh I believe did you make a motion for dismissal
26  are you just simply uh
27
28  SJ:   Look, I know that the that
29
30  BD:   I'm trying to classify that as a preliminary matter. Are you
31  making a motion? I kinda hear you said I will be making a motion or
32
33  SJ:   Well, the way the way I see that the issue based upon prior case
34  law is there if if the appellant can demonstrate  with evidence that
35  for some reason the delay and if in fact there was a delay and I
36  believe that the dates won't be contested here that uh if that somehow
37  cast doubt upon the validity of the evaluation of course that would be
38  a factual determination before the board so I'm not making a motion to
39  dismiss at this time although I will be I expect at the close of
40  appellant's case.
41
42  BD:   So was that a preliminary matter or your opening statement?
43
44  SJ:   Well, it was uh I just thought I'm sorry you're right.  I I wanted
45  to alert that
46
47  ?:    It was a heads up.
48
49  SJ:   Mr. Greeley as to the position we're taking with respect to that
50
51  BD:   I like that idea
52
53  SJ:   issue. Alright. I apologize for probably jumping around there.
54
55  BD:   Mr. Greeley?
56
```

1  RG:  Um I appreciate the heads up.  Uh I would only say towards that
2  matter in alerting the board to um be aware in advance of our position
3  on that issue that um although we are not disagree with the um
4  presentation of the precedent it's been established with the analysis
5  of the court decision in Sullivan vs. DOT um in this particular case I
6  I believe the Board uh must note that there are essentially four key
7  elements to um the alleged rule violations where we um where we argue
8  and if it please the board I'll just make this in the form of an
9  opening statement to save time.  We will be arguing that uh besides
10  being late that the evaluation uh was in in fact the annual evaluation
11  was due on 3/15/94 and it wasn't completed until September um depending
12  upon which date you look at um 12 11 12 13 so perhaps even the 15   I
13  don't think that that's important within three or four or five days,
14  but um the employee, as was noted by um the author of the decision in
15  Sullivan that I believe led to um the analysis that justified in the
16  board's mind overturning um a couple decades precedent by this board
17  and formerly the personnel board in interpreting this rule um I believe
18  the driving force behind the board's ruling in Sullivan was that an
19  employee was entitled by law to have an evaluation in their file um and
20  I presume ah that along with that is the entitlement to have an
21  accurate valid evaluation that covers the time period that's expected
22  to be covered as well as uh containing the information in the
23  evaluation that is identified ah that occurred within the identified
24  time period.  Ah we intend to show that um that didn't occur.  I do not
25  I do not believe that we would be arguing this case so the board
26  doesn't need to strain itself waiting for that that the delay was of
27  such significance as to need the court's test but in conjunction when
28  viewed in conjunction with the other violations removal and destruction
29  in our mind is certainly a valid remedy to request in the the event the
30  board uh doesn't feel that that's an appropriate remedy, I believe that
31  the appropriate action for the board to take is is not to dismiss the
32  charge or dismiss the case but to fashion its own remedy as seen to be
33  appropriate, and that's what we'd be asking the board to do.  The uh
34  other elements that we intend to prove uh besides the lateness of the
35  evaluation and the uh the evaluation being although it's marked as an
36  annual evaluation does not cover an annual review period it covers
37  something entirely different than that and that the evaluation contains
38  uh subject matter and makes reference to subject matter that occurred
39  outside the identified evaluation period and on top of that we would be
40  uh pointing out in four distinctly uh separate areas in the evaluation
41  where either contains information um we attempt to prove is blatantly
42  false factually incorrect uh understanding that the evaluation is a
43  subjective opinion of the of the supervisor however we will we will
44  attempt to show that the rule expects that those opinions will be based
45  on fact rather than fancy.  Thank you.
46
47  BD: Alright.  Anything else before we begin?  Alright.  Mr. Greeley,
48  you may begin.
49
50  RG:  I would call Kathleen House.
51
52  BD.  Ms. House, would you come forward please?  If you'd raise your
53  right hand.  Do you swear and affirm that the testimony you swear are
54  is the testimony you are about to give will be the truth?
55
56  KH   I do.
57

1  BD·  Thank you [?]
2
3  AW:  Would you state your name and spell your last name for our records
4  please?
5
6  KH:  Kathleen House, H O U S E.
7
8  BD:  Just relax.  Remember you you've had a overview of this before I
9  remember and so you should be comfortable with our environments just a
10 general hearing where you tell us your he'll ask you questions, you'll
11 answer them, counsel for the respondent will ask you questions, board
12 members may want to ask you questions we're just here to find out your
13 positions
14
15 KH:  Um hmm.
16
17 BD:  [unintelligible] Mr. Greenley, you may begin.
18
19 RG:  Uh, Kathleen, where do you work?
20
21 KH:  I work for the Department of Fish and Wildlife Management
22 Information Services, ah Game Division.  I think I've got that right.
23
24 RG:  How long have you worked there?
25
26 KH:  I've worked there since I was hired on March 15 of 1993, so that's
27 approximately two and a half years.
28
29 RG   March 15, 1993.
30
31 KH.  Right.
32
33 RG:  Ah was that your entry date in the State service?
34
35 KH:  Yes, it was.
36
37 RG:  Ms. House uh I believe alongside of you there is some documents.
38 I refer your attention to the document marked appellant's exhibit 2,
39 A2.
40
41 KH:  Okay
42
43 RG:  Are you familiar with that document?
44
45 KH:  Yes I am
46
47 RG:  Ah what is that document?
48
49 KH:  This is the second performance evaluation that I received and it
50 is um my annual evaluation um covering the period stated on the
51 evaluation from 10/93 to 6/94.
52
53 RG·  When was the evaluation completed?
54
55 KH   The evaluation was completed in September of 1994.
56
57 RG   Do you recall when the process uh of the evaluation began?

1
2    KH.   It began July 19, 1994.
3
4    RG:   You alleged ah in this rule violation appeal that there is
5    information contained in this evaluation that is out outside the
6    evaluation period that's been identified.  Directing you attention to
7    ah what would be the I believe fourth page in your document that begins
8    accomplishment of job requirements?
9
10   KH:   Um hmm.
11
12   RG:   And the third paragraph on that page.  Excuse me I'm referring to
13   the wrong on page that I uh I would refer uh I'm referring to the right
14   page the wrong paragraph I would refer you to the first whole paragraph
15   in page Is does that paragraph contain the information that you're
16   alleging is outside the time period?
17
18   KH  Uh yes, it does.  It contains part of it.
19
20   RG: Part of it.  Where is the other part?
21
22   KH: It's in the second paragraph.
23
24   RG:   The second paragraph.
25
26   KH:   Um hmm
27
28   RG:   And would you tell the board what information is contained in
29   there that that is outside the time period.
30
31   KH·   Uh the information that's contained in there that is outside the
32   time period um is concerning assignments that were made and completed
33   within the first evaluation period.  Um it says my original evaluation
34   discussed my disappointment some of the production systems application
35   and modifications were not completed more expediently allowing time for
36   new systems development.  And at he also mentions that your monthly
37   reports indicated that these assignments took far more time that the
38   few weeks you indicated in our meeting with Ms. Cusick. This
39   information shows that these assignments were covered in the first
40   evaluation and being brought up again here in the second evaluation
41   period.
42
43   RG: Okay. And how about the second paragraph that you're referring to?
44
45   KH: The second paragraph that I'm referring that has material from the
46   first evaluation period was last it says your execution of last
47   August's permit drawing process was discussed in your last evaluation.
48   I bring it up again only in the light of your dismissal of the trivial
49   nature of these duties and he goes on to um criticize that performance
50   um it is entirely contained within the first evaluation period.
51
52   RG: Okay and it there is there any information uh from from uh your
53   understanding that's contained in the second paragraph that refers to
54   anything other than the August permit drawing process?
55
56   KH. No. It's all the August permit drawing process.
57

1  RG: Okay. Ah I would ask you to refer to another document in ah
2  alongside of you that's been marked as appellant's exhibit 3 and
3  identified as uh the most recent performance evaluation you had before
4  this one.
5
6  KH· Um humm.
7
8  RG:  Ah we have indicated and and in fact the language in appellant's
9  exhibit 2 indicates that these matters were addressed in that previous
10  evaluation.  Can you uh reference for the board where there is um that
11  information in this evaluation?
12
13  KH:  Um is this for the first paragraph or the second?
14
15  RG:  Uh
16
17  KH:  or both?  Either.
18
19  RG.  Either one or both.  Just as long as you identify which which one
20  you're referring to.
21
22  KH    Okay.  Um for the first paragraph the timeliness of the execution
23  of the assignments this is the first paragraph on the first evaluation
24  under accomplishment of job assignments.  It begins·  in general I have
25  been satisfied with the quality of work you have accomplished. I had
26  hoped that some of the more productive system applications and
27  modifications might have been executed more expediently leaving more
28  time for new systems development.  However, I fully appreciate the
29  challenge the hunter query questionnaire system was to master, given
30  the poor documentation you were provided and my inability to assist
31  you, since I had never worked on the system either.  You did an
32  admirable job of mastering a complex system modifying its input job
33  stream to acco accommodate new variables and analysis into the system,
34  simplifying unnecessarily complex code and improving its documentation.
35  You did a good job of converting SC1 SAS version 5 datesets to version
36  6 and cleaning up excess baggage in on-line
37
38  RG:  And that continues on last page of that document.
39
40  KH:  Ah storage at SC1 that had unnecessarily been stored for years.  I
41  also appreciate that the miserable terminal emu evalua terminal
42  emulation environment we provided you severely handicapped hampered
43  your ability to communicate effectively with Service Center One.  Your
44  productivity increased markedly once given the appropriate terminal and
45  data communication protocol to use.
46
47  RG  Denote now which of the paragraphs in appellant's exhibit 2 does
48  that information pertain to?
49
50  KH: It pertains to the first one.  The time the um I dismissed these
51  concerns in that evaluation with allowances for perf for poor systems
52  documentation lack of familiarity with PRIMOS and inefficient terminal
53  emulation for SC1.  In our meeting with Ms. Cusick however you
54  dismissed these assignments as being janitorial in nature as if beneath
55  your skill level.  If these assignments were indeed janitorial and
56  beneath your skill level, they should not have they should have been
57  completed in a more timely fashion.  Your monthly reports indicate

1 these assignments took far more time than the few weeks you indicated
2 in our meeting with Ms. Cusick.
3
4 RG:  So if I understand correctly, everything after the first sentence
5 of that paragraph refers to information that was contained in your
6 previous evaluation.
7
8 KH:  Yes it does.
9
10 RG:  Thank you.  Ah would you ah refer to where in the uh appellant's
11 exhibit 3 uh the August permit drawing process ah is referenced.
12
13 KH:  You have proven to be an accurate
14
15 RG.  Excuse excuse me
16
17 KH:  Oh I'm sorry
18
19 RG·  Could you identify for the record where that's at.  Is that that
20 last page of the document?
21
22 KH:  Right.  This is in exhibit 2 uh marked marked A3.  It's in the
23 last page and it is under accomplishment of job requirements continued.
24 You have proven to be an accurate concerned employee willing to accept
25 responsibility for challenging projects and the occasional faux pas.
26 Your honesty and forthrightness in discussing the little irregularity
27 we experienced in the August permit drawings helped me understand the
28 problem and visualize improvements for next year.  Your willingness to
29 put in the extra effort to help correct the situation was greatly
30 appreciated.
31
32 RG·  Is there in and I believe you've indicated that that the entire
33 second paragraph was the accomplishment of job requirements on
34 Appellant's exhibit 2 is referencing that August permit drawing
35 process.
36
37 KH:  Yes, it is.
38
39 RG:  An another allegation that you've made in this rule violation is
40 that uh the evaluation that is identified as appellant's exhibit 2
41 contains blatantly false statements.  Uh would you be so kind as to
42 identify for the board where those statements are.
43
44 KH:  Um in under final eval ac accomplishment of job requirements
45
46 RG:  And that would be which which page of the documents are you
47 referring to?  It would be helpful for the board if you could find it.
48
49 KH:  It's on page one of the attachment.
50
51 RG·  Which would be page 4 of the document?
52
53 KH·  Page 4 of the document. And it's in the para one of the statements
54 is in the third paragraph.
55
56 RG   Okay.  And what is that statement?
57

1  KH:  Upon hearing of this you engaged in a prolonged agitated
2  discussion with Mr. Ferguson wherein you accused him of trying to steal
3  your job.
4
5  RG:  Okay. Now that's attributing to you um something that happened.
6  Did you have a prolonged agitated discussion with Mr. Ferguson where
7  you accused him of trying to steal your job?
8
9  KH:  No, I did not.
10
11 RG:  And uh where is the one that's of concern to you? Are you looking
12 at job reliability?
13
14 KH:  Yes, I am. Um ah your productivity has been impaired during these
15 episodes by your belief that a conspiracy exists to make you fail
16 professionally and undermine your social position and your conviction
17 that Mr. Ferguson was trying to steal your job.  Um I have never said a
18 conspiracy exists to make me fail professionally or to undermine my
19 social position and I have never said that Mr. Ferguson was trying to
20 steal my job.
21
22 RG:  Well, this credits you with a belief.  Do you have such a belief?
23
24 KH.  No.
25
26 RG:  He goes on to say as discussed in your prior evaluation and in at
27 least four meetings since then your fears and I I read that to uh refer
28 to the the fears that are referenced in the prior sentence are
29 completel your fears are completely unfounded.  Your behavior resulting
30 from these fears impairs your productivity and has become disruptive to
31 others in the workgroup your behavior has necessitated excessive
32 supervisory work to refute your allegations that your coworkers are
33 undermining your performance, trying to steal your job or that your job
34 assignments do not fit your job.  Uh there have been times when your
35 stress level has been so high that it has apparently led to insomnia
36 which when it occurred had a negative effect on your work ? programming
37 performance and participation in meetings.  If these fears prevail, you
38 need to seek professional assistance to address those issues.  Now, is
39 all of that information I just read relating to his contention that you
40 have fears as he has stated in here, as well as stemming from his
41 perception that you believe that there's a conspiracy that exists
42 against you.
43
44 KH:  Yes, all that does relate to that.
45
46 RG:  I I'd like to ask you if you know  uh is your supervisor a
47 licensed mental health practitioner?
48
49 KH:  Not that I know of.
50
51 RG·  Is he a licensed medical practitioner of any kind?
52
53 KH:  Not that I know of.
54
55 RG:  Have you ever indicated to him that that you were suffering from
56 stress so high that it has let to insomnia?
57

1  KH    Uh during one period in during the Christmas season and I just
2  said basically this is a time we discussed it it was a time of high
3  stress for everyone and that was one week during the Christmas season
4
5  RG:  So you had indicated that you were under some some degree of
6  stress.
7
8  KH:  Um hmm.
9
10  RG:  at a time when everyone seemed to be suffering from it.
11
12  KH:  Right.
13
14  BD:  We're recording so you have to remember to say yes or no.
15
16  KH:  Oh, I'm sorry.
17
18  BD:  No, no problem.
19
20  KH:  Yes.
21
22  BD:  We all are guilty of that.
23
24  KH:  Okay.
25
26  RG:  Let me let me refer your attention to to the paragraph following
27  the one we were just dealing with.
28
29  KH:  Okay.
30
31  RG:  Is there any part of that paragraph that uh you feel should be
32  part of this allegation of uh false statement.  That would be the last
33  paragraph in job reliability.
34
35  KH:  Okay.
36
37  RG·  That begins on page five uh there excuse me it would be page 6.
38
39  KH    Okay   Uh the persistence of these behaviors?  That one?
40
41  RG·  Yes.
42
43  KH    Okay.  Um you no I'm sorry could you repeat the question?
44
45  RG    Is there anything contained in that paragraph that you believe ah
46  that you were contending um is a false statement?
47
48  KH    Yes.  Um the persistence of these behaviors through your second
49  six months of employment with us is disappointing.  Yes, it is.  That's
50  a false statement.
51
52  RG    And what do you think behaviors do you understand he is referring
53  to?
54
55  KH    My belief that Howard Ferguson was trying to steal my job and my
56  belief that my coworkers are engaged in a conspiracy against me.
57

1    RG:   And again you testify that you have no such belief.
2
3    KH    Right.  Yes, I do.
4
5    RG:   Ah following along on that page, in personal relations, is there
6    um anything in the first paragraph that you contend um is a product of
7    false statements?
8
9    KH:   Um again, your belief in a belief in a conspiracy to manipulate
10   job assignments in favor of Mr. Ferguson has led to failures in these
11   interpersonal aspects of your job.  I do not believe that a conspiracy
12   existed.
13
14   RG:   And you've never indicated to your supervisor that such a belief
15   ah that you have such a belief?
16
17   KH·   No.
18
19   RG:   I would direct your attention to uh the long term development
20   portion of that same document.  Is there does that contain any
21   statements that you contend are products of false ah false statements?
22
23   KH:   Yes, there is.  You have repeatedly stated your concerns that your
24   IBM mainframe skill set will atrophy in your current work environment.
25
26   RG·   Have you stated those concerns?
27
28   KH:   No.  He may be confusing it with SAS, but I think a computer
29   supervisor should know the difference between IBM and SAS.
30
31   RG    Now, is you indicated SAS.  What is SAS?
32
33   KH:   SAS is the selective in which I was hired, the language that was
34   the selective for my position in which I received possibly two major
35   assignments over the course of two years.  The IBM it was understood
36   from the beginning in the interviews that that was a transition.  It
37   would be we would be moving to Unix.  I have that in my interview
38   notes.
39
40   RG:   Now, you indicated selective.  Is that a selective certification
41   criteria uh under which you were uh hired?
42
43   KH:   Yes, it was.
44
45   RG:   Now, what is SAS?
46
47   KH.   SAS is a statistical language um and it's it's a language that
48   used on any number of computer platforms and it's used for statistical
49   purposes, both scientific in scientific uh biological area and uh
50   social sciences.
51
52   RG:   Okay, so if I understood correctly, you've indicated that that you
53   may have suggested to him your feeling that your SAS skill sets
54
55   KH:   Right.  Yes.
56
57   RG:   might uh atrophy

1
2  KH:  I repeatedly stated that, because it was a very great concern of
3  mine that I was not getting assignments in SAS and that if you don't
4  use a language as intricate as SAS, you do begin to lose um your your
5  skill in it.  I never said that about the IBM mainframe mainframe skill
6  set because it was understood uh this is something that Tom Owens has
7  said over and over again and I agree with, that uh the computer world
8  is moving away from mainframes rapidly.  So that statement um is false.
9
10  RG:  I asked you some questions about your supervisors whether he
11  possessed any degree in um medical practice.  Is there's another
12  question I need to ask you.  Had has your employer at the Department of
13  Fish and Wildlife ah ever ah caused you to be evaluated by a medical
14  practitioner to determine your ability to perform the duties of your
15  position?
16
17  KH:  No, they have not.
18
19  RG:  So, any statement that may contained in here with respect to uh
20  what might appear to be a diagnosis of of some affliction
21
22  KH:  Um hmm
23
24  RG:  are are not based on based on any medical evidence that's been
25  provided or solicited by your employer?
26
27  KH:  Right   No.
28
29  RG:  Thank you.  I have nothing more.
30
31  BD:  Mr. Johnston?
32
33  SJ.  Thank you.  Uh Ms. House I'm Stuart Johnston assistant attorney
34  general.  I'd like to ask you a few questions about this evaluation
35  process if I may.
36
37  KH:  Um hmm.
38
39  SJ·  Uh do you recall first of all so we can just fix some dates do you
40  recall when you first sit down sat down with your supervisor to discuss
41  your performance evaluation uh that was conducted uh covering the
42  period of October of 93 to June of 94?
43
44  KH   Yeah, I found the note on my desk on the 19th and we discussed it
45  on the 21st.  We we first I discussed it on the 21st I believe
46
47  SJ:  Of July?
48
49  KH:  Of July, right.
50
51  SJ:  Do you recall uh months before that sitting down with uh Penny
52  Cusick, who's here today, and uh your supervisor specifically for the
53  purpose of of uh preparing this evaluation?
54
55  KH   No.  We did not.
56

1  SJ:  Do you recall meeting with Penny to discuss concerns regarding
2  *your relationship with your supervisor in the spring of 1994?*
3
4  KH   Yes.  That was at my request.  The first meeting, uh I had called
5  Ms. Cusick because ah I was very concerned over my job assignments and
6  did not know to who whom to call and uh she suggested I set up a
7  meeting with Tom Owens.  I was reluctant to do this because I was
8  afraid of retaliation.  I did eventually meet with Tom Owens in private
9  in February of 94 to discuss these particular the con the concerns over
10  my job assignments specifically.
11
12  SJ:  Do you recall meeting with Mr. Owens and Penny Cusick on May 19th
13  of 1994 to discuss certain issues relating to your classification
14  questionnaire and your CQ and certain job changes that you felt were
15  taking place in your position?
16
17  KH:  We did meet to discuss my job assignments.
18
19  SJ:  Uh do you recall meeting after that for the purpose of discussing
20  performance evaluation?
21
22  KH.  Not until not until the meeting with uh following the note that
23  was left on my desk.
24
25  SJ.  Okay.  Uh turning to the evaluation itself uh it looks as though
26  looking at the exhibit A2 that you prepared a very detailed uh
27
28  KH:  Um hmm
29
30  SJ·  and lengthy response about a sixteen or seventeen page single
31  spaced response to the remarks that your supervisor made in your
32  evaluation.  Is that that correct?
33
34  KH.  I did prepare a response.  Uh I haven't counted the pages but
35
36  SJ:  Alright, roughly that I
37
38  KH:  roughly
39
40  SJ:  I've thoroughly counted them.  Uh you've testified today for the
41  board and identified for the board certain portions of the evaluation
42  that your supervisor prepared that you disagree with either because of
43  time frame issues or because of uh disagreement with his
44  characterization.  Did you in fact raise
45
46  KH   Excuse me.  I need to correct that.
47
48  SJ:  Alright.
49
50  KH:  Not disagreements with his charateris characterizations
51  disagreements with statements that he's imputed to me
52
53  SJ:  Okay.  Um I'll be asking about that
54
55  KH:  Okay.
56

1  SJ.   just so we understand see if we can identify the difference
2  between his opinions
3
4  KH:  Okay.
5
6  SJ:  as opposed to statements having factual issues but
7
8  KH:  Alright
9
10 SJ:  uh did you address all of the issues that you've identified today
11 in your response to his evaluation
12
13 KH.  Yes, I did.
14
15 SJ:  So in the evaluation in in under the employee remarks portion you
16 had an opportunity to identify every area in the evaluation that you
17 felt was unfair or uh inappropriate or factually inaccurate, isn't that
18 correct?
19
20 KH.  Yes, I did.
21
22 SJ:  During the summer of 1994, I take it you did meet uh did you meet
23 on more than one occasion with Ms. Cusick and with Mis and with Mr.
24 Owens?
25
26 KH:  Yes, I did.
27
28 SJ.  in order to confer on the evaluation?  Do you recall roughly how
29 many times you met?
30
31 KH:  We met the first time, in which I received the um copy of my
32 evaluation I asked to be able to respond in writing and then we met
33 again in order to um go over my response and Tom Owens's response.
34
35 SJ:  Uh did you in fact do so?
36
37 KH:  We did.
38
39 SJ·  Did you discuss the issues that you've brought up today before the
40 Board, in other words, the his characterizations or his statements and
41 your disagreement with those statements?
42
43 KH:  No, we did not.  The reason do you need to know the reason or
44 should I go into that now?
45
46 SJ:  Oh, well, if you could answer first of all just did you discuss
47 the your written response to his evaluation, when you met with
48
49 KH.  The second time?
50
51 SJ:  Yes.
52
53 KH:  Yes.  Uh no, we did not.
54
55 SJ   Uh did you have any discussion at all regarding his versions of
56 events as opposed to your version of events?
57

1  KH:  We did not because um Ms. Cusick stated during the first meeting
2  in May that she was not a computer expert.  Very many of these um
3  evaluation concerns rely on knowing the difference between um routine
4  maintenance assignments and development assignments and the difference
5  between SAS, Unix, IBM and PCs and I felt it was not appropriate for
6  somebody who had stated that they were ignorant in general of p of
7  computer matters to go into depth about this evaluation.
8
9  SJ·  Um I'd like to just so that we can identify what areas you
10 disagree with if you could um turn to page four of A2, that's the
11 evaluation if you have it in front of you.
12
13 KH:  Um hmm.
14
15 SJ:  Uh I think I marked it on my copy of the exhibit but is it your
16 request that under accomplishment of job requirements that in paragraph
17 one
18
19 KH.  Um hmm.
20
21 SJ:  that all the language following the first sentence be deleted from
22 your evaluation?
23
24 KH:  Yes.
25
26 SJ·  And it's your request that the second paragraph in its entirety be
27 deleted from your evaluation?
28
29 KH:  Yes.
30
31 SJ:  Uh on the basis that this covers a time frame that was discussed
32 in your previous evaluation, is that right?
33
34 KH:  Right. Yes.
35
36 SJ.  Okay.  And are there other strike that question it's also your
37 request with respect to statements that you believe are false
38 statements
39
40 KH:  Um hmm.
41
42 SJ:  You're talking about uh one sentence in the third paragraph of
43 that same category under accomplishment of job requirements you've made
44 a statement that there was a sentence that you disagree with that's
45 having to do with a confrontation with Mr. Ferguson?
46
47 KH:  Yes.
48
49 SJ:  Have you ever made a statement to your supervisor that you believe
50 that others that you work with are uh or were in some form or another
51 undermining your ability to perform your job?
52
53 RG:  Object.  Uh unless you're clarifying when the question is ? to the
54 evaluation period that's in question.
55
56 SJ:  That's a a fair objection.  To for purposes of time frames, during
57 the period covered by this evaluation, um have you ever complained to

1  your supervisor that you believed that coworkers were in some way or
2  another undermining your ability to perform your work?
3
4  KH:  Uh we did discuss the withholding of technical information during
5  our meeting on the in February 15th.
6
7  SJ:  And it was your it was your position that information was being
8  withheld from you by other coworkers.
9
10  KH   Specifically, I was being given less and less access to technical
11  information in a very rapidly changing environment.  I was not being
12  included in the loop.  Yes.
13
14  SJ:  You felt that ah you believed did you express to him your belief
15  that this was being done intentionally in order to uh put you in a
16  position where you couldn't do your job properly?
17
18  KH:  No   I also did not ever say it was a conspiracy.
19
20  SJ·  Thank you.  I don't have any further questions.
21
22  BD·  Any board member have any questions of  Ms. House?
23
24  AW:  Ms. ? you have a question?
25
26  NR: Uh I guess I'm just trying to understand a little bit more about
27  the issue of certain individuals deliberately withholding technical
28  information.
29
30  KH:  Um okay.
31
32  NR ·  Could you explain?
33
34  KH.  Uh alright.  This is covered in my response so it probably would
35  be better if uh okay um there when
36
37  NR .  Where?  Where in your response?  These pages aren't numbered, so
38
39  KH:  I know, I couldn't I was going to uh basically it um you're right
40  it is a lengthy response, so finding particular items is is kind of uh
41  time consuming.
42
43  NR :  Could you just say it in your own words?
44
45  KH:  Okay.  Um we were changing to a platform called Unix, um and it
46  was new to all of us, and any information that we got about Unix was
47  basically um exchanged among people um they people would like say you
48  know the emulator went down today, the server's down.  We have two
49  systems administrators uh well, Randy Kreuziger, my supervi my coworker
50  and this person with the same job title I have um who's supervised by
51  Tom Owens um was had the role of systems administrator at that point to
52  some extent even though he didn't have the title.  People would give
53  him information first about what the system was doing um whether
54  machines were up or down whether we had installed new products uh what
55  effects these new products would have on people.  It was an environment
56  where you would come in in the morning and something would have been
57  installed overnight and you wouldn't know what to

1
2
3    NR ·   It was!
4
5    KH:   and um a specific instance I referred to in this was that we came
6    in and there was a new product on the PC um it had been it was a
7    network card and um I tried to find out information about it and was
8    told that um you know just to you know just go you know carry on as
9    usual um and when I later when the terminal later went down um because
10   um there was another problem with EMACS on another server, um this is
11   what Tom Owens has characterized as um my making you know my making my
12   my having responding incorrectly to that first question and then making
13   too much of the failure in the first place.   I had asked Tom Owens I
14   had asked Tom Owens, Randy Kreuziger and Chris Ringo, who was systems
15   who was official systems administrator, and was not told that the
16   emulator had gone down, it was an emulator failure.   They discussed it
17   with each other, they did not tell me about it, and um at so that was
18   one of the ones referred to in this evaluation.   Um another when I went
19   to ask about the server being up, I went to ask Chris Ringo and he's
20   not in our group, his supervisor interrupted and said I was to um I was
21   to go to um a help line that had only recently been established and
22   that everyone there was making fun of because of its ineffectiveness
23   because they did exchange information with each other they you know
24   they they did know much more about the system than the people at this
25   help line, but I was instructed by Chris Ringo's boss or supervisor to
26   call this help line.   I went over to my supervisor at that point and
27   said you know where can I get information about this new server and
28   what it does?   And he told me also to call the help line.   So I was not
29   to ask my coworkers, I was not to ask um the people in other work
30   groups about this, I was to call a help line that they had made fun of
31   as being ineffectual.   And there there are other instances, I do need
32   to I would have to look at those notes.
33
34   NR .   Who was it that was precluding you from asking coworkers, do I
35   understand you correctly?
36
37   KH:   Pardon?
38
39   NR .   Are you saying someone was precluding you from asking coworkers
40   about this?
41
42   KH·   Tom Owens told me that I was to call when I told him about that.
43   Chris Ringo's supervisor told me to call Don Chase, who was very hard
44   to get ahold of and when I finally did get ahold of him, he just
45   snarled at me, I'm not the only person that knows this and then left
46   the room.   Uh but Chris Ringo's supervisor said that Chris Ringo had a
47   problem with interruptions he's a very nice person he's very
48   knowledgeable in a new environment and everybody was was hitting him
49   for um for answers and he his supervisor was right, he was not in our
50   work group, I had a person there, Randy Kreuziger, who was as
51   knowledgeable, with whom Chris often shared information that I should
52   have been able to ask and
53
54   NR :   Okay, I'm I'm just interested in the pattern, not the not the
55   specifics of the who, but what's the pattern that you're describing
56   here?
57

KH:   The pattern is that when like a server went down

NR    Uh I mean the the pattern of quote certain individuals deliberately withholding information?  Not the details of who, what, where, what's the what's the pattern here?

KH:   The pattern is that um the people such as Chris Ringo, uh Randy Kreuziger and um occasionally Howard Ferguson would as new information came up about the technicalities of the system would share that information among themselves and when I asked about that um either as in like Chris Ringo's case, I was I was specifically told not to ask or um I was not included in that loop I would have to either go directly to the person and they may or may not answer the question at that point or they would simply say they didn't know.

NR    So you were saying to your supervisor that you thought you weren't being included in the loop, is that what you're saying?

KH:   Right, yes, uh huh.

NR :  Okay, thank you.

BD·   Mr. Greeley, anything else?

RG:   Yes, I had a couple things.  Just to uh hopefully to clarify that a little further, Kathleen, ah what is your classification?

KH:   Computer analyst programmer III.

RG.   Computer analyst programmer III.  Uh the people that you were dealing with who had the information that you felt you should uh uh be included that that you felt should share that information with you

KH:   Uh huh

RG    What are their classifications?

KH:   Randy was a computer programmer analyst III, um Chris is a CIC2, um which is also a

RG:   What?

KH    CIC computer information um consultant II I believe that the last C is for consultant um 2 he was at that time um and Howard Ferguson's a biologist III.

RG    A biologist III

KH:   Um hmm.

RG    So that so some of your concerns about having information shared is concerns uh that someone who is not in the computer field uh may have had key information that would be necessary for you to know without that information being shared with you?

1    KH:  Uh part of my concern is that, but the majority of my concern is
2    simply in order to do my job, I needed this information with the same
3    timeliness as these other people.
4
5    RG:  Okay.  Now in expressing your concerns to your supervisor about
6    not being able to get information, was it your concern as you've stated
7    that uh the information wasn't wasn't being provided to you that was
8    necessary to do your job or were you just simply complaining that
9    people uh uh weren't giving you information or that people were were
10   withholding information from you as some kind of a game or something?
11
12   KH·  It was my concern that I wasn't being provided with timely
13   information in order to do my job.
14
15   RG.  Okay.  The other thing I would ask that this be marked I would ask
16   that that be marked as Appellant's 6.
17
18   SJ:  I'm showing you what's been marked as appellant's exhibit 6, Ms.
19   House.  Could you identify that document?
20
21   KH:  Um this is the note that was left on my desk um announcing the um
22   commencement of the second evaluation.
23
24   SJ.  Okay, so earlier in your testimony in cross examination when you
25   indicated that the first meeting you had to discuss your evaluation
26   occurred uh at a certain point in time after you received a note
27
28   KH:  Yes.
29
30   SJ:  Is this the note that you were referring to?
31
32   KH   This is the note.
33
34   SJ.  I would move for admission.
35
36   RG:  No objections.
37
38   BD:  Appellant's 6 is admitted.
39
40   SJ:  I have nothing more.
41
42   AW·  Question on on A6 uh received 7/19 is that what date it says on
43   the top?
44
45   KH·  It does.  I have the note itself uh
46
47   AW:  That's okay.
48
49   KH:  it didn't xerox real well.  It did say 7/19, yes.
50
51   AW:  Okay.  Thank you.
52
53   BD:  Alright, anyone else have any questions of Ms. House?  Thank you
54   very much for your testimony, you are excused.
55
56   SJ:  Uh may we have a couple of minutes break?
57

```
1   BD:  ? fine coupla minutes ?
2
3   SJ   Oh, I'm sorry.
4
5   BD:  completed?
6
7   SJ:  Yes, I've completed.  Thank you.
8
9   BD   Alright. Then it's appropriate time for us to take a seven point
10  five minute break.
11
12  SJ: Thank you.
13
14  BD:  Alright we're off the record.
15
16  [break]
17
18  BD:  Alright, uh, Mr. Johnson?
19
20  SJ:  Uh thank you.  Uh before proceeding to on behalf of respondent I
21  will be now making a motion to dismiss this rule violation appeal on
22  the grounds of previously uh stated to the board.  Uh as the board is
23  aware this appeal challenges the timeliness of this evaluation.   I
24  respectfully submit that at this juncture there has been no evidence
25  suggesting that the timeliness issue in any was impacted the substance
26  of the evaluation itself.  Uh as previously argued uh presented to the
27  board, it is our position that the delay itself does not justify the
28  destruction or removal of the evaluation from uh Ms. House's file, so
29  for that reason uh respondent is moving to dismiss the claim that this
30  evaluation should be removed on timeliness grounds   I did run copies
31  of the Sullivan case, which I uh provided to the Board.  With respect
32  to the allegation that the evaluation the substance the content of the
33  evaluation is inappropriate, respondent is moving that that allegation
34  also not be considered and should be dismissed.  The reason for that is
35  essentially this:  the evaluation process necessarily involves a
36  subjective assessment of employee performance by the employee's
37  supervisor.  In essence, what Ms. House is asking this board to do is
38  act as a body that would once again revisit the issues that were raised
39  and discussed thoroughly between the supervisor and the and the
40  employee.   I don't believe that this is that the board's role is one in
41  which the board would act in essence as a as a uh a body that would
42  revisit the subjective performance assessments of a supervisor or to
43  disagreements between the supervisor and the supervisor's employee.
44  What we imagine if the board starts doing that function carrying out
45  that function how often the board would end up uh having to wade
46  through evaluations and make determinations there is when they're
47  boiled down are subjective at best.  Uh what rule has been violated is
48  the question that needs to be asked by the board I think at this
49  juncture.  Ah it's our position that there has been no showing that
50  there has been no showing that there has been a violation of the rule
51  governing performance evaluations except for the lines in the rule that
52  requires evaluations to be performed within sixty days of the
53  anniversary date of the employee.  And we've already discussed that
54  that in itself does not justify removal of the evaluation from the
55  employee's file.  So for those reasons uh respondent is asking that
56  this matter be dismissed.
57
```

1  BD:  Mr. Greeley?
2
3  RG·  Uh would that it be so simple.  I can understand why Mr. Johnston
4  would like to have the matter dismissed, but regardless of Sullivan
5  versus DOT, regardless of the precedent of the board with regard to ah
6  whether ah removal and destruction is an appropriate remedy for a
7  violation of these rules uh this appellant if the only issue before the
8  board is timeliness of uh completion this appellant would still have
9  the right to expect the board to enter a decision acknowledging a
10  violation of the rule.  The the remedy that the board fashioned to that
11  violation uh because it is a violation of the rule, whether it's
12  advisory or not, the rule states very specifically shall be conducted
13  in a specific period of time.  Employee is entitled to a finding that a
14  violation occurred and a remedy uh the remedy that's spoken to  and
15  that was the whole issue in Sullivan um doesn't have to be removal and
16  destruction for timeliness.  The remedy could be a board order that
17  this employee be provided with timely evaluations in the future.  You
18  know the board has the capability of fashioning remedies beyond what
19  the employee asks for.  Or it's it's not my impression that this board
20  has ever uh ruled that the only remedy that they have available to them
21  in a rule violation appeal is that that's being requested by the
22  employee.  The employee has an an obligation to request a remedy as
23  part of the filing process, but it's the board's wisdom that presumably
24  is going to be uh dictating what remedy is created by the board.  The
25  the other issue is uh the argument that there's been no there's been no
26  proof or any violation beyond timeless um  that's just not that's just
27  not correct.  Uh you have before you the rule that in subsection 1 says
28  agency shall evaluate the performance of the employees during their
29  probationary trial periods and at least once a year thereafter.  2  The
30  annual evaluation will be conducted during the sixty day period
31  following the employee's anniversary date, except an agency can
32  establish on a consistent basis a due date which better accommodates
33  the agency's particular needs.  Well, you have testimony before you as
34  to what the anniversary date is.  3/15 is the anniversary date.  It's
35  right on  the evaluation.  The employee was hired into state service on
36  3/15.  The board has has the right to take notice of the rules and and
37  the rules on on uh establishment of anniversary date would clearly
38  establish her anniversary date as 3/15.  So there there's proof of that
39  there there has been no offering of evidence by respondent that would
40  indicate that the board that the agency has created a different date
41  than an anniversary date on a consistent basis and we would argue that
42  no such date exists that if rules belong in in ? to say that agencies
43  will utilize the standardized employee performance procedures and forms
44  described by the director of personnel, appellant's exhibit 4 is those
45  that procedure.  Uh this board has accepted and ruled in the past that
46  these procedures are the rules to follow.  And in these procedures, in
47  in number 2, the first sentence both employee and supervisor
48  independent independently rate employee's performance for the rating
49  period again ah we have evidence before you that is clear evidence that
50  this current evaluation the contested evaluation contains information
51  outside the evaluation period   It's that's inappropriate.  That's a
52  violation of the rule.  We don't continually reevaluate a person's
53  performance for the same period of time, we deal with the time period
54  in question.  There's evidence of that.  The rule the rule requires it.
55  The procedure requires it.  It goes on in that same section to indicate
56  the rating should be done on the basis of results achieved on the job
57  as described in the CQ and should not not is underlined focus on the

1    employees personality traits.  Well, half the evaluation focuses on the
2    employee's personality traits.   We have we have shown in in to argue a
3    motion on a contention that if the board involves itself in as a trier
4    of fact with respect to content of evaluations that you're inviting uh
5    you're inviting an onslaught of evaluation appeals, I would argue that
6    the other way, if the board makes it clear that what is expected in an
7    evaluation is factual integrity, then what you'll have is factual
8    integrity occurring in the system and you won't be confronted with
9    evaluation appeals coming to you.  This employee has as much right to
10   expect factual integrity in her evaluation with respect to the
11   information that's being contested as she does to expect that if the
12   supervisor alleged that on the 14th day of June, she did something
13   specific she did something specific and she could show that on the 14th
14   day of June she was in Juneau, Alaska, and not even at work, the I
15   believe it would be appropriate for the board to excise that comment,
16   to require that that kind of comment or that kind of information
17   relating to factual errors be removed from the evaluation.  That's what
18   we're asking for here.  It's an appropriate remedy.  Subjectivity is
19   one thing.  Manufacturing facts is something else.  You know, a
20   subjective interpretation of fact is one thing, but crediting this
21   person, with a with a mindset that's that's analytical and diagnostic
22   in nature, when the employee sits here before you and testifies under
23   oath, that I do not believe that.  That must come out of the
24   evaluation.  The sup that is not a subjective statement. The supervisor
25   is not saying I think you believe this, he's saying because you believe
26   this, these things have happened, these things are affecting your
27   performance.  That that information is relative to this case, it's
28   relative to the violation, and it's been proven.  So it's not an issue
29   of dismissing this case for the lack of proof, or because the on
30   because the only issue we've proven is one of it being conducted within
31   sixty days following the time period.  It's marked as an annual
32   evaluation and yet it clearly is for some period other than the annual
33   period.  You know all of those things result in one thing and that's
34   that the decision cries out for the board to say very clearly we expect
35   factual integrity in the content of evaluations, pure and simple.
36
37   BD:   Okay.
38
39   ? :   Could I ask a clarification of Mr. Greeley.  In your arg in your
40   opening argument and what you were just saying, you've said that the
41   rule expects a supervisor's opinion to be based on fact, not fancy.
42   Where in the rule does the rule say that.  I mean, can you point out to
43   me how the rule addresses this issue of fact.
44
45   RG:   No, I can't do that, ah because the the rule the rule is written
46   in such a was as to expect that proper things are going to occur rather
47   than accusing people that they're that they're going to do things that
48   are so unreasonable that they're not even worthy of mention.  Why why
49   would you say in this that that a supervisor would be expected to only
50   put things in that could be factually determined when for them to do
51   anything else would be inconsistent with the whole product process of
52   evaluation?  Why would a super why would anybody even contemplate that
53   a supervisor would be allowed to make something up and judge an
54   employee on what's being made up?  Again, I use the analogy of of uh at
55   a supervisor putting in an evaluation that on such and such a date a
56   person did something and that the employee is not even at work on that
57   date, it's clear that that wouldn't be allowed.  Without the rule

1   saying it in boldface type.  It's an expectation that information will
2   be based on performance and that language is in here, that that the
3   evaluation the employee must be rated on performance the performance
4   during a particular period of time, and that carries with it an
5   expectation that that performance is factual, rather than manufactured,
6   or the imagination of the supervisor.  And that's what we're talking
7   about.  You can if when you read the rebuttal to the evaluation you can
8   see very clearly that there are many elements to this evaluation that
9   Ms. House does not agree with and there's exception that she's taking
10  in her rebuttal to many many contentions of her supervisor that are
11  made in a in a subjective nature that's within the supervisor's right.
12  We're not here asking that all of that information come out.  We're
13  here asking that wherever that supervisor has based an impression on an
14  incorrect fact and we've proven that those facts are incorrect, that
15  that information may not exist in the evaluation.  To do otherwise is
16  impinging on her right to have an accurate evaluation for the time
17  period that is identified.
18
19  BD    Anything else?  Alright, do we wanna take a caucus and move on a
20  motion?
21
22  AW:   Okay.
23
24  BD.   Okay, we'll take a five minute.
25
26  [break]
27
28  BD:   In response to the respondent motion, the board will grant in part
29  and deny in part.  The board will grant the respondent's motion as it
30  relates to the timeliness issue and deny it related to the charges of
31  the time period of the evaluation, the false statements and those areas
32  brought out.  And we'll be responding to in a written decision.
33
34  SJ:   Thank you.  We are prepared to proceed with one witness.
35
36  BD:   Aright.
37
38  SJ:   Penny Cusick.
39
40  BD:   Raise your right hand, please.  Do swear or affirm that the
41  testimony you are about to give will be the truth and nothing but the
42  truth, so help you God?
43
44  PC:   Yes.
45
46  BD:   Please be seated.  Would you state and spell your last name for
47  our records, please?
48
49  PC:   Penny Cusick, C U S I C K.
50
51  BD:   Mr. Johnston, you may begin.
52
53  SJ:   Thank you.  Ms. Cusick, what's your position with the department
54  of Fish and Wildlife?
55
56  PC:   Uh personnel officer 4.
57

1  SJ:  How long have you been employed with uh the department?
2
3  PC:  Well, with Fish and Wildlife, since March of 94.  Sinc with
4  Wildlife, since um fall of 1989.
5
6  SJ:  Do you know the appellant?
7
8  PC·  Yes.
9
10  SJ  Uh do you recall uh during the spring of 1994 ah any events taking
11  place uh involving the appellant and the performance evaluation that
12  was prepared and ultimately uh finalized in September of 94?
13
14  PC:  Yes.
15
16  SJ:  Can you uh tell the board uh describe your involvement in the
17  evaluation process?
18
19  PC:  Well, uh Kathleen started calling me and I believe she also spoke
20  with another member of the personnel staff um early in the spring um
21  stating that she was having some problems with her classification
22  questionnaire, the selective certification that she was hired under and
23  uh some other on the job issues some of her assignments that she was
24  being given. Um I recommended that she sit down and talk to her
25  supervisor about it, she was reluctant to do so.  She and I talked
26  several times over the phone and a couple of times in person and um we
27  discussed the fact that her performance was due and I said maybe we
28  could use that as an opportunity for the three of us to sit down and
29  talk about the issues of uh her classification questionnaire and job
30  assignments specifically.  Um her performance evaluation was due on her
31  anniversary date, which was March 15.  Um I contacted her supervisor in
32  April to enquire about the status of the performance evaluation.  He
33  said that it was a very lengthy process, he was mired down it, he was
34  having a difficult time getting it written, he knew that it was going
35  to be very contentious, and so Kathleen and I talked about me being a
36  part of the performance evaluation to keep things on track rather than
37  getting into the he said she said kind of a a conversation.  So I told
38  Kathleen that I would be meeting with Tom on May 12 to discuss where he
39  had gotten in the performance evaluation and that the three of us,
40  Kathleen and Tom and I, would sit down on May 19th to talk about um her
41  CQ, the her selective certification, her job assignments, etcetera, as
42  a prelude to the actual performance evaluation.
43
44  SJ:  Did you in fact meet in the fall or excuse me in the spring to
45  discuss those preliminary matters that were part of part of the
46  performance evaluation?
47
48  PC:  Right.  Tom and I Tom and I met on May twelfth to discuss where he
49  was in the performance evaluation um what he felt about the accuracy of
50  her C her classification questionnaire, etcetera, and then Kathleen and
51  Tom and I met on May nineteenth.
52
53  SJ:  Um you've heard uh reference to a meeting in July, were you in
54  attendance at that meeting as well?
55
56  PC:  Yes, I was.
57

1   SJ:  I'd like to ask you some questions regarding the evaluation itself
2   uh that that was prepared by Mr. Owens.  Uh did you uh assist and
3   advise Mr. Owens in preparing the evaluation and if so can you describe
4   what your role was?
5
6   PC:  I I didn't assist him in preparing the evaluation, I reviewed
7   information that he had prepared.
8
9   SJ:  So it was not your role to determine he content of the evaluation
10  itself or the subjective assessments within the evaluation?
11
12  PC·  No.  I I did check on some things after the fact, but not when it
13  was being prepared.
14
15  SJ   Do you recall with respect to performance dimension A and I refer
16  to Exhibit A2 and it should be there in front of you uh turning to to
17  page 4 with re the attach the first page of the attachment.  There's
18  been some testimony regarding uh time frames.  Uh do you have any
19  knowledge as to um the relevance of the language following the first
20  sentence under the first paragraph of that attachment.  Do you know why
21  and if you don't you can say so, but do you know why that was included
22  or did you discuss that with the supervisor?
23
24  PC:  I did discuss that with the supervisor and he included uh the
25  first two paragraphs as a point of reference, something to refer back
26  to um a point in the past.
27
28  SJ   Do you recall in in your meetings with the supervisor and with the
29  appellant uh that this subject coming up as to events that took place
30  in August outside the time frame of the evaluation?
31
32  PC:  We during our meetings on the evaluation, we certainly discussed
33  these ev events, yes.
34
35  SJ:  Uh when you say point of reference, what do you mean by that?
36
37  PC:  I mean a reference point [laughs].
38
39  SJ:  That's a good answer.  Let me ask you another question.  Uh do you
40  would you in as a representative of the department find that it would
41  inaccurate or inappropriate to remove those two paragraphs from the
42  evaluation as requested by the appellant?
43
44  PC:  Would it be inappropriate to remove?  Probably not, although um
45  the type of assignments that Kathleen was being given, um that was one
46  of the most contentious parts of our discussion and I think that Mr.
47  Owen put these paragraphs in here to refer to the fact that um she was
48  dismissing these particular assignments as being just being
49  housekeeping or janitorial, so inappropriate to remove, probably not.
50
51  SJ·  Uh with respect to the evaluation process, did you continue to be
52  involved up through the finalization of this evaluation?
53
54  PC:  Yes.
55
56  SJ:  Oh how many meetings did you were were you participant in between
57  Ms. House and her supervisor?

1
2  PC    I believe three meetings, possibly four, but three that I
3  definitely remember that went on for several hours.
4
5  SJ:  Uh during these meetings, can you generally describe what took
6  place, and then I'm speaking specifically of meetings uh in order to
7  accomplish the eval the performance evaluations, not the preliminary
8  meetings in the spring.  How were they conducted?
9
10 PC:  Uh we met in a very small room um at the Union Street meeting in a
11 very small room and it was uh I guess I wouldn't characterize it as an
12 argument between Kathleen and Tom but it was um they were very
13 contentious meetings on um what her assignments had been what the
14 future would hold for her position whether or not um she was working
15 within the guidelines of her classification questionnaire um a a lot of
16 disagreement.
17
18 SJ.  Uh you've heard testimony today regarding Ms. House belief that
19 there are inaccurate statements in the evaluation.  Do you recall um
20 and I'd like to ask you specifically about a comment that's contained
21 on the first see it'd be page four of exhibit A2 of the third paragraph
22 a comment by Mr. Owen and I'm quoting upon hearing of this you engaged
23 in a prolonged agitated discussion with Mr. Ferguson wherein you
24 accused him of trying to steal your job.  Do you see that?
25
26 PC:  Yes.
27
28 SJ:  Uh do you recall that issue being discussed at any time?
29
30 PC:  Uh I recall it being discussed during the meeting.  I also went to
31 Mr. Ferguson and asked him.
32
33 RG·  I object.  I object   She has testified um that she did not offer
34 advice to Mr. uh Owens in the preparation of the document and whether
35 or not she talked to somebody after this was over is irrelevant to what
36 we're doing   I I think that's also hearsay, although I know the
37 board's feelings about hearsay.
38
39 SJ:  I believe it is relevant if we're going to be getting going down
40 this road and there's an allegation that this is a false statement uh
41 to at at least establish for the purposes of this hearing the fact that
42 there was some effort made to determine whether this in fact happened
43 or not.
44
45 AW:  I'm I'm not sure of the objection.  Are you also objecting that uh
46 if any meetings occurred it was outside the time parameters you're
47 referred to?
48
49 RG:  There's been there's been no no offer no showing no foundation
50 laid for when such a meeting occurred or for what role was being played
51 by this witness in that meeting.  Again, if ah if they're going to
52 contend that what Ms. House is testified to is not true, then they
53 should have Mr. Ferguson here to testify to that or they should have
54 Mr  Owen here to testify to it, not a personnel officer who was
55 functioning as an as she's testified in some intermediary role between
56 the two parties in the evaluation process.
57

1  BD:  Do you have any uh [unintelligible]
2
3  BD:  Alright, uh we'll allow the question and give it the necessary
4  weight.
5
6  SJ:  Uh you can go ahead and answer.  You were you were testifying I
7  believe at the time of the objection that you had contacted Mr.
8  Ferguson?
9
10  PC    Right.  I spoke with Mr. Ferguson um about this incident and what
11  he said is Kathleen blew up at me, she was yelling at me and accused me
12  of trying to steal her job again.
13
14  SJ:  With respect to when when this conversation occurred uh uh in fact
15  what led you to contact Mr. Ferguson on this subject?
16
17  PC:  Actually, Mr. Ferguson had contacted me earlier about the incident
18  and after reading through this I back to Mr. Ferguson and asked him if
19  this was the incident that he had contacted me about earlier?
20
21  SJ:  Uh did this incident that you describe take place within the time
22  frames of the evaluation covered by the evaluation?
23
24  PC:  I don't know.
25
26  SJ:  With respect to the allegation or not the allegation but the
27  characterization of Mr. Owen that where he characterized Ms. House as
28  believing that a conspiracy existed, do you recall any discussion
29  occurring between the appellant and Mr. Owens during these meetings
30  these evaluation meetings on that subject?
31
32  PC:  Um I do recall the discussion um not being a computer expert I
33  don't recall the uh exact program that they were talking about but
34  there was some sort of network or internet kind of program that a
35  certain number of people in their unit were trying out as a uh I don't
36  know if it was to see if they wanted to use it to see if it was gonna
37  be of benefit to the agency but there were a few people that were
38  chosen to to uh spearhead that and Kathleen was not one of them and she
39  was trying to find out information about this and it had some cute name
40  that I'm sure Kathleen remembers that I don't remember um and she was
41  trying to find out some information about it and evidently had been
42  told you know when this is up and running you'll get the information
43  you don't need to know it now it's this group of people that UM is
44  spearheading this project or program or or whatever and that she would
45  get the information when she needed the information it wasn't a part of
46  her job and she um was expressing that she felt left out of the loop
47  and that she should have this information that they had even though she
48  wasn't involved in this pilot program or whatever it was.
49
50  SJ:  Do you recall the mention the term conspiracy being brought up in
51  the course of conversations with Ms. House or Mr. Owens?
52
53  PC.  I don't recall if that word came up, no.
54
55  SJ:  You mentioned that in your conversation with Mr. Ferguson there
56  had he you said that she had blown up at had did he complain that this
57  been had had happened before as well?

```
1
2   PC:  Yes.
3
4   SJ:  Um more than once?
5
6   PC:  [sighs] He I I don't recall a number of times um but he had come
7   to me stating that there were um problems with Kathleen getting angry
8   with him in the workplace.
9
10  SJ.  Are they coworkers?  Are they located in the same place?
11
12  PC.  They were in the same large room of the building, um different
13  cubicles.
14
15  SJ:  There's a characterization here in the evaluation that I'm looking
16  at with the attachments to A2 characterization that and this would be
17  let's see one two the third page of the attachment would be page six
18  A2.  There's a characterization uh under personal relations the last
19  line of the first paragraph says your resultant behavior has diminished
20  the group's interest with working with you.  Do you know what group Mr.
21  Owens is referring to?
22
23  PC   I can only assume that he means the computer group which would
24  include not just the people that Tom Owens supervised but the other
25  people working in the area Howard Ferguson being one who did not report
26  to Tom Owens but reported uh to Jim Rieck I believe.
27
28  SJ:  Um were there uh do you have personal knowledge of any other
29  members of the group expressing uh this sentiment of not wanting to
30  work with Ms. House based on her uh conflicts with Mr. Ferguson?
31
32  RG·  Uh appellant objects    It's irrelevant uh that sentence that's
33  being referenced is not a sentence that we're contending uh is
34  inappropriate.  Uh it's that's been addressed in the rebuttal.
35
36  KH   It's not true.  It's not true   I'm sorry, I I don't know if I I
37  probably can't say anything I don't think this is is right.
38
39  SJ:  I I I had in my notes and perhaps the board's notes are did didn't
40  disagree I had thought that that was a statement that that the
41  appellant was complaining about in the evaluation and wanted to
42  determine whether it had a factual basis.
43
44  RG:  Any what's being referred to in the evaluation for clarification
45  is any statement in there that is that is attributed to his statement
46  that that she has a belief in a conspiracy to manipu this particular
47  section that she has a belief in a conspiracy to manipulate job
48  assignments in favor of Mr. Ferguson.  She's testified she has no such
49  belief and so any reference any conclusions reached as a by the
50  supervisor as a result of his his relying on some belief that doesn't
51  exist should be excised.
52
53  AW:  My understanding was that it was the preceding sentence which was
54  objected to and not this sentence, is that correct Mr. Greeley?
55
56  RG:  If if if that last sentence if
57
```

KH:   Right.

RG:   If what we're hearing is testimony that that last sentence relates to the belief, then I'll withdraw my motion for irrelevance.

BD:   Okay.   Uh he said one answer covers all of them

SJ.   I I guess not

BD:   as related to that sentence he's saying that anywhere well are those

SJ:   If he's not if there's not a challenge to the last sentence and its and the characterization reflected therein then I I won't ask about it if I'm assuming that's what he's saying I won't I won't inquire about it.

RG:   Again, to make it clear uh if if we're hearing that it's their contention that that sentence where it says resultant behavior rather than rather than relating to uh other information in that paragraph that it actually relates to her belief in a conspiracy that's identified in a previous sentence then I'll withdraw my objection to relevance and it would be appropriate under our request for the board to consider that last sentence to be one we want removed.

BD·   Well it clear Mr. Johnston?

?

SJ:   Uh if I can rephrase the question or just ask it again uh do you have any knowledge of uh Ms. Cusick of of any other members of this group in expressing to you or to Mr. Owens that they did not wish to work with Ms. House during the time period that's relevant to this evaluation?

PC:   Yes.

SJ:   Can you can you describe those persons?

RG:   I would I would object unless she's testifying that the their reluctance to work with Ms. House is because of her belief in a conspiracy to manipulate job assignments for Mr. Ferguson then I would con I would offer that that's irrelevant.

AW·   Let's try it this way:   How bout if you are proposing the appellant is proposing is appealing the sentence before this that your belief in a conspiracy and also the word resultant in this last sentence is that what the what you're trying to get rid of?

RG:   Yes.   If that if that im if his uh opinion is based on behavior he believes *results from*

AW:   You're you're suggesting we strike the word resultant

KH·   He [unintelligible]

RG    Yeah.   Yeah.

SJ:   Thank you for your assistance.  I think I I should have got that drift but I some reason were missing it.  Um I don't have any further questions.

BD:   Anyone else?

RG·   Uh I have I have a couple.  I believe you indicated that you don't remember when Mr. Ferguson contacted you?

PC    Right.

RG    So you don't you're it's not your testimony that he contacted you with a complaint that occurred during this evaluation period.

PC:   It was several months before um Kathleen contacted me which would have been early spring.  I I think we first started talking in in February or March or April

KH:   January

PC:   January?  Very early spring uh and it was several months before that that her coworker had come.

RG    Okay, uh referring your attention to appellant's exhibit two um page five I believe it is the first page would be um attachments.  You testified that you believe that the first two paragraphs were put in as a point of reference.  Do you agree that the language contained in those first two paragraphs have been covered in another performance evaluation?

PC:   I think the incidents were covered the language was put in here

RG:   Well, *again*, *regardless of what the language was put in for*

PC:   I believe the incidents were but not the meaning that's in these paragraphs and what

RG:   Okay but the events that are being referred to here occurred outside the period being covered by this evaluation, yes or no?

PC·   The events were, yes.

RG    Okay.  The I have nothing.

BD.   Aright. Anyone else have any questions?

NR:   Just a quick clarification.  I I wanna check out my notes I've got a double negative in here um I believe Mr. Johnston asked you something about these first two paragraphs we were talking about about whether it would be inappropriate to remove them and I think you said probably not and I'm I'm trying to translate out the double negatives.  Does that mean it's probably appropriate to do it or?

PC:   Well, I hate to use the word appropriate, I don't think it would be inappropriate to remove them but they're in here for a reason

1  NR    Which is?
2
3  PC:   To uh the biggest contention throughout this whole process was
4  what kind of assignments Kathleen was being given by her supervisor,
5  are the other people being given all of the quote good assignments and
6  Kathleen being given the uh what she referred to as janitorial
7  assignments or housekeeping assignments and I think he put these two
8  paragraphs in here to strengthen the fact that he believes these were
9  not necessarily janitorial beneath her level whatever so yes these
10  events were covered but the reason for having them in here was to sort
11  of a strengthening point of clarification or something.
12
13  NR:   You say they're in here because he wanted to make the point that
14  these assignments were not quote janitorial or housekeeping in nature,
15  is that what you're saying?
16
17  PC:   Right.
18
19  NR:   Any other questions of this witness?
20
21  KH:   Uh I'd like excuse me
22
23  RG:   Excuse me
24
25  KH:   Can I ask can I
26
27  RG:   Ask me.
28
29  KH    Oh, ask you.
30
31  [unintelligible]
32
33  RG·   You've indicated that the first time that you met was for the
34  purpose of ah beginning the evaluation process, for lack of a better
35  term.
36
37  PC    Right.
38
39  RG    How did you convey that to Kathleen?
40
41  PC    Uh Kathleen and I discussed before the meeting on the 19th the
42  items that we would like to bring up in meeting with uh Mr. Owen and
43  those were the selective certification on the recruitment for her
44  position the adequacy of her classification questionnaire the detail in
45  her classification questionnaire and whether or not her job was
46  changing, all of those things that would be then be discussed as part
47  of the performance evaluation.
48
49  RG    But I believe your testimony is that that um you met for the
50  purpose of conducting her evaluation.  How would you convey that that
51  message to Kathleen?
52
53  PC·   Over the telephone.
54
55  RG·   What manner?  Characterize how you how you informed her that that
56  was the purpose of the meeting.
57

1  PC.  I called her and I told her that um Tom Owen was having a
2  difficult time completing her performance evaluation, she knew that
3  thirty days had gone past from her uh anniversary date, we discussed
4  the fact that the personnel office keeps track of um when performance
5  evaluations are due, when thirty days have gone by, when sixty days
6  have gone by and the amount of information that gets sent out to the
7  supervisor during that time, that this would be a good opportunity to
8  use this as a reason to sit down with Mr. Owen and discuss these other
9  job related issues since we needed to also do the performance
10 evaluation and that this um would maybe take some of the edge off she
11 was afraid of retaliation from Mr. Owen if we sat down and discussed
12 what was in her CQ and whether or not um she was being given
13 assignments that were consistent with her CQ and I said this is a good
14 opportunity we have to review your CQ as part of your performance
15 evaluation.  It's going to be a contentious evaluation.  I'll meet with
16 Tom on the twelfth we'll figure out what he has written down.  On the
17 nineteenth we'll begin the process by discussing these items that you
18 and I have been talking about over the last couple of months.
19
20 RG   You heard Ms. House testify that she had contacted you uh and had
21 met with you and had had meetings with Mr. Owens and you before uh what
22 she contends was the July 21st date where the process began and that
23 those meetings the na that the purpose of those meetings was to discuss
24 concerns she had about job assignments about working within
25 classifications um etcetera. It
26
27 PC:  We did have a meeting on May 19th to discuss those issues, yes.
28
29 RG:  Okay.  That was the purpose of the meeting on May 19th?
30
31 PC:  The purpose of the meeting on May 19th was what I've just described
32 to you.
33
34 RG:  To discuss those issues.
35
36 PC:  To discuss those issues as the beginning of her performance
37 evaluation process, yes.
38
39 RG:  Okay.
40
41 BD:  Any other questions of this witness?  Any board members have any
42 questions?  Thank you very much.  You're excused.
43
44 RG:  Appellant rests
45
46 BD:  Are we ready for closing
47
48 RG:  I'd like to put Ms. House back on the stand for one or two uh
49 clarifying questions, and then I'll be prepared to go to closing.
50
51 BD:  Alright.
52
53 BD:  Ah we remind you you're still under oath.  Please be seated.
54
55 KH   Okay.
56

1  RG:  Ms. House, with regard to the May 12th meeting, uh were you ever
2  informed that that meeting was intended to be a discussion with regard
3  to your performance evaluation?
4
5  KH    No, I was not.
6
7  RG    Thank you.  Is it your understanding the meeting was set up
8  specifically as a result of your concerns and your request to have
9  someone intervene to uh to attempt to come to a clarification as to
10  what your job assignments should be?
11
12  KH:  It was.  Uh it was set up specifically because I had met with Tom
13  Owens about my job assignments and had been unable to resolve it.  The
14  meeting was set up at Ms. Cusick's instigation
15
16  RG:  It was set up what
17
18  KH:  at Ms. Cusick's instigation but not at that time to begin the
19  evaluation process.
20
21  RG·  Okay.  Was there any sharing of of performance documents or
22  discussion of performance evaluation documents at that time?
23
24  KH:  No, there was not.
25
26  RG:  Thank you.  I have nothing
27
28  BD:  Anyone else have any questions?
29
30  SJ:  I have no questions.
31
32  BD·  Thank you very much.  Are we ready for closing?  Mr. Greeley,
33  please proceed.
34
35  RG·  Merit system rule 356-30-300 requires that that policies and
36  procedures the department of personnel in per in conducting performance
37  evaluations and the appropriate forms be used in the in the
38  accomplishment of that.  In this particular case, I believe that we've
39  proven that the form in this case speaks for itself uh in appellant's
40  exhibit 2 this evaluation has been identified as an annual review and
41  in accordance with the rule it would be required to cover the period of
42  3/15 ninety uh 3 to 3/15/94 and instead it covers a period of 10/93 to
43  6/94.  That's a violation of the rule. The evaluation clearly contains
44  and is based on information that that occurred outside the evaluation
45  period.  That is not allowable.  I whether it's being used as a point
46  of reference or not, the testimony of Ms. Cusick that that the intent
47  of this was to reference assignments that had been made essentially in
48  defense of a concern about what's been portrayed as janitorial
49  assignments um it's not appropriate to reference assignments that have
50  been made outside the evaluation period.  This evaluation and the
51  discussions around the evaluation and the concerns that were expressed
52  as a part of the evaluation process pertain to the performance of the
53  employee during the period and even if what uh even if the portrayal by
54  Ms. Cusick is exactly the intent of Mr. Owens in this case and we we
55  have our doubts about that because again he's not here testifying we
56  can't ask him those questions, but even if it were, it would be
57  inappropriate to use an example of an assignment that was made before

1  prior to the point in time of the evaluation period.  After all, if she
2  was expressing those concerns and he was trying to quell those
3  concerns, then it wouldn't be appropriate to use something in the
4  distant past in an attempt to answer those.  Was she or wasn't she
5  *being assign being given proper assignments during the evaluation*
6  *period?*  And so clearly those those uh paragraphs should be excised
7  from this document and I believe that what you're hearing is the agen
8  the agency's ah spokesperson here testifying that it's not going to
9  bother them if that occurs that it wouldn't be inappropriate to remove
10  those sections from the the evaluation.  And I would I would ask you
11  when you're considering these ah if there's at all any question in your
12  as to what there is about these that might bother Ms. ah House is it to
13  look at the nature in which those which her involvements with those
14  assignments is being referenced in this evaluation and then go back to
15  the last evaluation and look at how they were referenced.  They were
16  referenced in a positive was in the last evaluation and they're
17  referenced in a very negative way in this evaluation and that's
18  tantamount to reevaluating a person for that period of time and Ms.
19  House believes that that's in retaliation for the concerns that she
20  expressed over the proper job assignments.  Ms. Cusick testified that
21  *her involvement in this process was primarily the product and the*
22  *manner in which she set the meeting up on May 12*th *was partly the*
23  product of Ms. House's concern that there may some be retaliation
24  against her if in fact she came forward with concerns about the
25  integrity of her assignments.  So in this particular instance they meet
26  on May 12th, they have those discussions, and in her evaluation that's
27  presented to her in July, lo and behold, he's reevaluated her for
28  something that was covered in the last evaluation and it's portrayed in
29  a completely negative fashion.  So if there's any questions about why
30  those sections bother her, it should be clear when you read those why
31  they do.  Uh and and it should be clear to the board when you read the
32  procedures that's appellant's exhibit ah 4, that the that the
33  requirement is for her performance to be measured ag that her the
34  evaluation measure her performance of job duties during the evaluation
35  period.  There's strengths and weaknesses.  It should be clear that the
36  expectation is that it has to cover information that occurred during
37  that period.  Last but not least is the issue of the of the false
38  statements again what's being said in here on the same page I've just
39  referring to upon hearing of this you engaged with a prolonged agitated
40  with Mr. Ferguson wherein you accused him trying to steal your job.
41  You have the participant an alleged participant in that confrontation
42  sitting here testifying *under oath I did no such thing.  I did not*
43  *accuse him of trying to steal my job.*  You hear Ms. Cusick testifying
44  that Mr. Ferguson contacted her on numerous occasions and said he'd had
45  problems with uh with the appellant and on one occasion had indicated
46  this but she doesn't remember when.  She doesn't know whether it's
47  during the evaluation period or not.  So I I think that it's clear
48  where the credibility should be with respect to that issue.  Ms  House
49  unequivocally testifies that no such statement was said to Mr. Ferguson
50  and that should come out of the evaluation because it's a factually
51  incorrect statement.  In job reliability, the section that begins your
52  productivity has been impaired by these episodes by your belief that a
53  conspiracy exists, Ms. House testifies that no such belief exists.  Ms.
54  uh Cusick testifies that during the discussion she doesn't remember any
55  discussion about conspiracy.  Again, it should be clear there is no
56  belief of a conspiracy.  She did have concerns about the way in which
57  she was being dealt with but for him to make these findings and offer

1   these opinions rather than saying your behavior leads me to feel that
2   you you might ah feel that a conspiracy exists.   He's not saying that.
3   He's saying you believe a conspiracy exists and then he's then he's
4   attaching to that a whole bunch of symptoms that ah he's and rendering
5   opinions that are inappropriate under the circumstances.  He goes on
6   with the persistence of these behaviors and the behaviors that he's
7   talking about is is is understanding that she believes there's a
8   conspiracy, that should come out of the evaluation.   In personal
9   relations, again, her belief that a conspiracy to manipulate job
10  assignments in favor of Mr. Ferguson that that statement she testified
11  she has no such belief, no such belief at all   Where it says your
12  resultant behavior, ah Mr. Wong did clarify our concern about that.
13  Again, we're not we're not arguing that the supervisor is does not
14  possess the abili the the authority to render subjective opinion, but
15  he doesn't have the authority to manipulate fact or manufacture fact.
16  So if that is saying that her behavior results from her belief in a
17  conspiracy, that must come out.  And it may be as simple as scratching
18  resultant in that particular case.  We believe that we have proven the
19  case that uh I believe it's unfortunate that the the timeliness issue
20  has been dismissed but the board has acted on that and that's that's
21  past.  Uh the other three contentions we believe the burden has been
22  met very clearly and that the appropriate remedy in this case is the
23  remedy that's being requested, that the agency be required to remove
24  and destroy this document and not replace it with another document of
25  its kind, until it has until it has been constructed in accordance with
26  the rules which would then require that it that it cover an accurate
27  period of time, that it would contain ah factually accurate statement
28  and it would be based on information that occurred during the
29  evaluation period.  Thank you.

31  BD.  Thank you, Mr. Greeley.  Mr  Johnston?

33  SJ   Thank you.  Ah looking at the notice of appeal that Ms. House
34  provided to the board filed with the board, uh it appears there are
35  three remaining issues that are being addressed here   The first has to
36  do with the time period and whether or not the time period covered by
37  this evaluation is uh constitutes a violation of the rule.  Ah WAC 356-
38  30-300 does call for evaluation to be conducted during probationary or
39  trial and we know that the first evaluation was a result followed upon
40  the heels of the probationary period.  The uh annual evaluation was as
41  we've heard through the testimony of both Ms. House and Ms. Cusick was
42  ah the process was in place on or about Ms. House anniversary date
43  which was March 15, although it wasn't completed until September, uh so
44  it does although it doesn't it precisely fit the annual requirement it
45  does cover a period that is within the spirit of the rule and should
46  therefore not be stricken on that basis.  There's a third claim or the
47  second claim that's before the board that remains before the board has
48  to do with the events and circumstances outside the evaluation period I
49  believe that primarily focuses on uh one performance dimension which
50  accomplishment of job requirements un included comments uh by Mr. Owen
51  that covered time periods that were covered in a prior evaluation.  And
52  we've heard Ms. Cusick characterize those and explain why they were
53  there uh when you look at the text and again this would be the fourth
54  page of the uh A2 it appears as though paragraphs one and two were
55  included to ah express concern by the supervisor with respect to Ms.
56  House's characterization of the work that was uh performed in August,
57  that is August of uh 93, as being janitorial, and those comments uh if

1  we look at the remarks in Mr. Owens evaluation the comments were made
2  during the meeting during the meeting with Ms. Cusick and uh this
3  obviously caused concern by the supervisor because she Ms. Ms. House
4  was dismissing the assignments as being janitorial.  So the comments
5  were made characterizing work that was done outside the evaluation
6  period but they reflected her state of mind during the meeting with Ms.
7  Cusick in an effort to carry out the evaluation for this time period of
8  uh October to uh to June of ninety uh four and it does reflect a state
9  of mind that I think appropriately does need to be addressed by the
10  supervisor.  Uh that would cover the first two paragraphs of
11  accomplishment of job requirements.  Technically, yes, they do address
12  performance that occurred outside the time frames, but it appears when
13  you look at the text that he was quite concerned Mr. Owens was quite
14  concerned as Ms. House characterization characterization occurred
15  within the time frames of the evaluation at least during the meetings
16  um to discuss the evaluation.  So its clear as to why they're there.
17  We get into an area and I'd like to talk about the last issue before
18  the board and that has to do with the allegation that the evaluation
19  contains numerous blatantly false statements.  Ah evaluations always by
20  necessity contain characterization adjectives uh it is clear that
21  there's quite a bit of concern by the appellant here with respect to
22  the use of the choice of the supervisor to use the word conspiracy uh
23  because of what that implies.  The supervisor obviously used that word
24  to best characterize his belief that she Ms. House felt that there were
25  others that worked in her work group who were working together in some
26  way or another to deny her information.  Obviously, the supervisor felt
27  that that belief by Ms. House was not accurate and that she was
28  unnecess she was that this concern on her part that people were against
29  her was somehow impacting her work and the work of the group.  As a
30  supervisor he has an obligation to bring that concern to her attention
31  That's what the evaluation process was designed to accomplish.  I think
32  this board has has heard and seen enough situations involving conflicts
33  between supervisors and their subordinates to understand the the
34  problem here.  There is a the supervisor sees things one way, the
35  employee sees it another, the supervisor has an obligation to be honest
36  and candid and explain to the employee during the evaluation process
37  exactly where that employee stands.  It would be a disservice to the
38  employee to to pretend that there weren't problems if in fact in the
39  supervisor's mind there are.  And that necessarily involves use of
40  terms such as in this case it's a strong term a conspiracy a belief in
41  a conspiracy.  It could be a use the use of a term say an employee's
42  unnecessarily rigid or doesn't follow instructions well or any number
43  of potentially negative characterizations.  The relief that Ms. House
44  is asking the board to grant is essentially to change words in an
45  evaluation to take words out of the supervisor's mouth by claiming that
46  they're dishonest.  Well, I don't think they're dishonest comments or
47  false comments, they're a true representation of how the supervisor
48  sees Ms. House.  If the board ends up granting relief here, I can't
49  imagine any evaluation that would not be before the board.  Somebody
50  might say, I'm not rigid, I'm not uh easily uh upset by everyday work
51  problems, I resent that, that's false, I'm going to go to the board and
52  appeal it.  And then the employee can come before the board and say I
53  want that bad word and it could be any number of adjectives that that
54  we see often in evaluations and ask for it to be removed.  So I think
55  there is to some extent a the a slippery slope here if the board ends up um
56  coming in and uh ruling on the proper choice of words that a supervisor
57  might include in an evaluation.  And I'd strongly urge the board to

1    decline that opportunity and and refrain from from such activity.  With
2    respect to the process, I think the process was followed and that board
3    should limit itself in looking at the process to make sure that the
4    process was fair.  But getting down into second guessing the use of
5    certain adjectives is beyond the purview of this board and I think
6    properly so.  And for those reasons respondent asks the board to
7    dismiss this appeal.
8
9    BD:  Aright.  Any board members have any final comments?  Okay, this
10   hearing will be closed.  The board will issue its decision within the
11   statutory time lines.  Thank you very much for your opinions here
12   today.  The hearing's closed.
13
14
15
16
17
18
19
20
21
22
23

```
                                    FILED_____LODGED
                                    _____RECEIVED

                              OCT 3 0 1998

                              CLERK U.S. DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON AT TACOMA
                        BY                              DEPUTY
```

1

2

3

4

5

6                                         HONORABLE FRANKLIN D. BURGESS

7

8                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF WASHINGTON**
9                              **AT TACOMA**

10   KATHLEEN M HOUSE,                    |    NO  C97 5708FDB

11                       Plaintiff,       |
            v                             |    AFFIDAVIT OF CHRIS
12                                        |    RINGO
     WASHINGTON STATE DEPARTMENT          |
13   OF FISH AND WILDLIFE,                |

14                       Defendant.       |

15

16   STATE OF WASHINGTON )
                         ) ss
17   COUNTY OF THURSTON  )

18        1  I, CHRIS RINGO, being first duly sworn on oath, depose and say  That I am 40 years

19   of age and competent to be a witness in this matter

20        2. I am the manager of the Technical Services Section of the Wildlife Resource Data

21   System Division (WRDS) with the Washington State Department of Fish and Wildlife

22   (Department).    The section has the primary responsibilities of applications and database

23   development, PC support, and general technical support for the Wildlife Management Program

24   (WLM)  I was given Kathleen's supervision beginning on December 1, 1995  At that time, WRDS

25   had just been reorganized, creating the Technical Services Section in the process.    Kathleen's

26   primary job responsibility were applications and database development.

                                         1

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St. SE, Bldg  3
PO Box 40145
Olympia, WA  98504-0145
(360) 664-4167

1

2          3. When I took over Kathleen's supervision, she was working on a mailing label application

3    in Paradox for Windows assigned to her by her previous supervisor  Paradox is the standard

4    PC-based database management software that WLM has been using over the past few years  The

5    Information Systems Division (IS) of the Management Services Program made the decision to

6    purchase Sybase for the agency's UNIX network in early 1995, in an effort to begin the creation of a

7    centralized database for the agency  This was the beginning of an effort on the agency's part to both

8    move away from stand-alone PC-based databases (eg, Paradox), and also to update existing agency

9    databases that had been housed on the agency's aging Prime minicomputer  At the same time, IS

10   picked, Powerbuilder as the new agency standard software for applications development  The

11   important point here is that for WLM at least, this meant that the agency would be moving away

12   from Paradox, and towards Sybase and Powerbuilder

13          This is a very large undertaking, as WLM has a large installed base of Paradox, and a few

14   recently developed applications written for Paradox (the Enhanced Game and Diversity System -

15   EGADS, in particular)  As manager of a newly-created applications development group, I took

16   some time to evaluate our options in this regard.  After a couple of months, in the spring of 1996, it

17   seemed to me that the best direction for WLM to go was to follow the agency's lead, and begin to

18   move away from developing applications in Paradox, and toward Sybase/Powerbuilder  A

19   significant factor in that decision was Kathleen's almost constant insistence that Paradox's

20   programming environment was bug-ridden, making it an extremely difficult environment in which to

21   turn out a reliable application within a reasonable time frame.

22          Such a transition of course takes a significant amount of time.  It seems logical that the first

23   stage in any such transition is to finish up any work already under way  Toward this end, Kathleen

24   was working on a couple of applications in Paradox that needed to be completed before she could

25   begin any new applications in Sybase and Powerbuilder.  These were the previously mentioned

26   mailing label application, a Harlequin Duck Banding application, and an Upland Bird application.

2

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St SE, Bldg 3
PO Box 40145
Olympia, WA 98504-0145
(360) 664-4167

1   In addition, there were a couple of Paradox applications left partially completed by Howard

2   Ferguson when he left to take a new position; these needed to either be completed in Paradox, or

3   scrapped completely and re-written in Sybase and Powerbuilder

4       When the Technical Services Section was created, Ferguson's vacant position was transferred

5   to it from the Game Division. Howard was a Biologist 3 (Range 50), although his job was primarily

6   applications development for the Game Division.  When I began the hiring process for that position

7   in June 1996, I changed the job class to the Computer Analyst Programmer (CAP) class of the

8   equivalent range, namely CAP 4 (Range 50).  In deciding what qualifications to pursue in the new

9   position I was faced with the decision of whether to hire someone with Paradox experience to help

10  finish up existing Paradox applications, or to try to hire someone with Powerbuilder experience to

11  help us "jump start" our transition  Since we already had several people with Paradox experience, it

12  seemed natural to look for the latter, which I did

13      4  I believe that Kathleen's assertion that she was denied promotion to CAP 4 is completely

14  without basis  When I began the hiring process in June 1996, Kathleen had not yet finished the

15  Paradox mailing label application  In fact, Kathleen did not "unveil" the finished application until

16  August 7, 1996, when she-demonstrated it to Jim Eby (my supervisor), myself, and support staff  In

17  addition, she worked into the fall of 1996 finishing up the Paradox Harlequin Duck Banding

18  application  Sending Kathleen to Powerbuilder training (a four day course) would have been a

19  waste of resources, because, in my experience students of complex software will not retain or

20  remember their training unless they are able to put it immediately into use  In fact, shortly after the

21  agency purchased Sybase in March 1995, several agency personnel, including Kathleen, attended a

22  week-long Sybase training  Since Kathleen did not use Sybase for quite a while following that, she

23  had to re-take the training at a later time, when she was ready to actually use it

24      In short, Kathleen was not ready for Powerbuilder training until the fall of 1996 (she

25  attended that training in October 1996 See Attachment A), so she would have been unable to attain a

26  similar level of expertise as someone hired with a year's experience.  Marvin Young, who was born

3

1    in 1956, was hired in January 1997 with over a year of experience in Powerbuilder, and has proved

2    a valuable asset to our effort, and indeed has provided mentoring to Kathleen in Powerbuilder

3    programming.

4       5  In response to her claim to have made every effort to obtain Powerbuilder training and

5    SQL experience, I must say that I do not know what those efforts were; she certainly did not fill out

6    a training request form for me to consider.  When we met in January 1996 to discuss her job duties

7    within the newly created Technical Services Section, she expressed keen interest in developing her

8    skills in Powerbuilder and Sybase  I was sensitive to her needs, and included those duties in her new

9    Classification Questionarre (CQ)  At the same time, we included Paradox duties in her CQ with the

10    understanding that she would be phasing out those duties over time as she finished her current

11    assignments in Paradox. Her claim to have been denied Powerbuilder training seems to me to have

12    been fabricated only after I decided to hire someone with a year's Powerbuilder experience

13       In addition, her allegation about my offering the SQL software to Don Saul and his

14    subsequent declining of the offer is inaccurate, and misleading  This event occurred when Rob

15    Pearce of IS came to our workgroup's area to install the software on anyone's PC who might have a

16    use for it  The software is installed on a PC, and is used to access Sybase databases on the UNIX

17    network  Rob installed it on Kathleen's, Marvin's, Randy Kreuziger's, and my PC, since we have the

18    most obvious need to access Sybase, as applications developers  In addition however, Don Saul

19    develops applications for the program's Geographic Information System (GIS)  When I asked him if

20    he wanted the software on his PC, he simply said that he was tied up with other duties for the

21    foreseeable future, and would not be able to use it for a while  Thus he declined the offer

22    Kathleen's statement seems to imply that it was offered to Don because he is a male, which is

23    absolutely absurd.

24       In summary, at no time during my supervision of Ms. House did I deny her training in order

25    that she be ineligible for promotional opportunities  That she did not receive Powerbuilder training

26

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St. SE, Bldg 3
PO Box 40145
Olympia, WA 98504-0145
(360) 664-4167

1  until October 199 was dictated solely by the schedule on which she completed her then current
2  assignments

3      7  Without further elaboration on Kathleen's part, it is difficult for me to say what kind of
4  information Kathleen feels that I am withholding from her. She refers to a conversation that we had
5  regarding informal sharing of information, and concluded by saying that I told her that in order to be
6  included in the informal network by which information is passed, she should stop making claims of
7  discrimination This is again inaccurate and completely misleading

8      The conversation to which she refers did indeed take place between us, on November 16,
9  1996  It was during a meeting I called with her as a result of remarks she had made to me during a
10  conversation we had the previous day  During that conversation, Kathleen asserted that the reason
11  that two (male) members of WLM support staff (Tracy Loveless and Jim Bevan) had the ability to
12  print to a UNIX network printer, and that Jera Fazekas (a female member of the support staff) did
13  not, was due to gender-based discrimination  In fact, that ability was the by-product of those two
14  individuals being chosen by the support staff supervisor (Bobbi Monk - a female) to be the Wildlife
15  Management Web Editors  During the meeting I called with Kathleen to discuss her remarks, I
16  explained to her that I felt that dropping off-hand, unsubstantiated remarks accusing people of
17  discrimination into casual conversation as she had done, was inappropriate and damaging both to the
18  people against whom she was making the accusation, and to her personal relationships  I told her
19  that discrimination of all kinds was a serious matter, and it required the proper forum to address
20  adequately  Following that meeting, Kathleen e-mailed me to clarify that discussion  The e-mail that
21  I sent back to her, with her e-mail message imbedded in it, is included here  See attachment B

22      8  I must admit that I am not aware of a work-based social group that meets after work,
23  and so I can't respond to her allegation that she was excluded from this group

24      9. WRDS determines its own training needs. Normally, if an employee feels that they
25  need training, they make a case to their supervisor  If the supervisor feels that it's a valid request,
26

5

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St SE, Bldg 3
PO Box 40145
Olympia, WA 98504-0145
(360) 664-4167

1  it is passed on to Jim Eby, the WRDS manager  He handles the budget, and ultimately
2  determines if it's a priority and if the money is available

3       10  In regards to determining who has access to "0" phone numbers, such as
4  CompuServe, I was not even aware that the agency had access to 900 numbers  I didn't think that
5  we could dial a 900 number from our phones  I did not have access to CompuServe's 900 phone
6  number in 1994

7       11  The program must prioritize who gets upgrades to software, computers, and
8  equipment  Each Division prioritizes it's own computer and software upgrades, with consultation
9  from WRDS  Therefore, each Division does it differently depending on work related priorities
10  In WRDS, Jim Eby handles the budget and so he has the final say  Since the Technical Services
11  (TS) section was formed, which I started to manage in the fall of 1995, the process for TS is
12  about the same as it is for training  If one of my employees feels that he or she needs an upgrade
13  of some sort, that person would need to explain the reasons and justification for it to me, and if
14  the request is valid, I will present it to Jim Eby for his consideration  Jim will determine if there
15  is money in the budget for the item, given other priorities of the Division & Program  In some
16  cases, upgrades are purchased simultaneously for the entire Program, as in the case of Corel 7 0
17  WP Suite

18       12  Ms. House alleges that her computer failed in October 1996 and when she requested
19  backup tapes and drives, she did not receive them  I recall her hard drive failed around that time
20  I wrote up some documentation regarding that incident and a subsequent incident in which she
21  had the capability of backing up her system, and yet did not

22       The situation with tape drives in Wildlife Management is everyone is responsible for
23  backing up their own PCs, and we had two Colorado tape drives for staff to use for this purpose.
24  Everyone, including Kathleen, has been aware of this  It has never been a matter of being
25  granted permission to use them  The system is in place and employees have freely used them for
26  this purpose, taking responsibility for backing up their own machines as they deemed necessary

6

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St SE, Bldg 3
PO Box 40145
Olympia, WA 98504-0145
(360) 664-4167

1   There is no one person in charge of the drives   Basically, an employee needs to ask around to

2   find out who has one. So I'm not sure who Ms House would have asked to lead her to believe

3   that an employee was withholding the equipment from her. It certainly was not me. Also, it is a

4   little late to ask for a tape drive after your hard drive has already crashed.

5         For a period of time up until approximately October 1996, these Colorado tape drives had

6   been rather unreliable, so I advocated we buy a new tape drive. I researched the alternatives, and

7   in September 1996, we purchased a new high-capacity DAT tape drive   We received it in

8   mid-October, and began to test it  Sometime in November or early December, Kathleen used the

9   drive to backup her home PC (with my permission, since she said she had work-related files on

10  it)  But even though her hard drive on her work PC had crashed only a month or two earlier, she

11  did not backup her work PC, even though she had the capability of doing so  This became

12  apparent when she accidentally deleted her /Windows/System directory on December 17, 1996,

13  and did not have a tape backup to undo the damage.

14        In summary, I'm confused by this allegation  If Kathleen is claiming that she was denied

15  access to the Colorado tape drives, I am not sure who it was that could have done the denying

16  They have always been common property, freely available to all, and there was no designated

17  person signing them out  You just find one and use it  If on the other hand, she is claiming that

18  she was denied access to the new DAT drive, then I must strongly disagree  Indeed, the facts and

19  documentation shows that the situation was actually quite the opposite  she had access to the

20  DAT drive, she used it to back up her home PC, and yet she did not use it to back up her work

21  PC. Ms House did this even though she had recently been caught without a backup when her

22  hard disk crashed. In light of this documentation, I can't imagine that she would make such a

23  claim

24        13  Ms House states she requested a larger monitor in 1994, but did not receive a new

25  one until 1996  I don't know anything about her original request, as I was not her supervisor at

26  that time, nor did I work with her  But in 1996, when her monitor failed, I was her supervisor at

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St SE, Bldg 3
PO Box 40145
Olympia, WA  98504-0145
(360) 664-4167

1    that time. I immediately ordered her a new monitor, and gave her a loaner until the new one

2    arrived.

3        14   I recall that Ms. House complained to me and others about rude behavior of an IS

4    employee on April 22, 1997   A copy of documents relevant to that complaint are attached as

5    Attachment C

6        14   I am not aware of any disparate or unfair treatment of Ms. House during her

7    employment with the Department

8

9

10                                      _____

11                                      CHRIS RINGO

12    SUBSCRIBED AND SWORN to before me this 28th day of October, 1998.

13

14                                      _____

15                                      NOTARY PUBLIC in and for the State
                                        of Washington. My commission
16                                      expires _Oct. 4, 2001___

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Labor & Personnel Division
905 Plum St SE, Bldg 3
PO Box 40145
Olympia, WA  98504-0145
(360) 664-4167