UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KATHLEEN M. HOUSE, | Case No. No ~~CV97-5708FDB~~ |
| | C98-5262 FDB |
| Plaintiff, | PLAINTIFF'S RESPONSE TO SUMMARY |
| | JUDGEMENT MOTION |
| vs. | |
| WASHINGTON STATE DEPARTMENT OF FISH | |
| AND WILDLIFE AND THE STATE OF | |
| WASHINGTON, | |
| Defendant | |

COMES NOW the plaintiff, Kathleen M House, and files this response to the defendant's Motion for Summary Judgment. This response is based on the following facts, points of law and attached supporting documents

### STATEMENT OF THE FACTS

Plaintiff was hired as a Computer/Analyst Programmer III in March of 1993, by the Washington State Department of Wildlife. She was hired at a salary in the mid range of for that position due to her excellent qualifications and to the fact that she would not accept the position for less than half of her then wage of $60,000/year. The Classification Questionnaire under which she was hired required expertise and experience in the programming language SAS and in database design and implementation. Plaintiff exceeded these qualifications many times over.

Plaintiff's supervisor, Tom Owens, exhibited hostility towards



1   KATHLEEN HOUSE, PRO SE

plaintiff's expertise in computers from her very first days of employment. He frequently made derogatory remarks concerning plaintiff to the group in which she worked, excluded her from work related meetings and social occasions both during and after work hours, refused to recognize work she had completed, assigned tasks in the languages for which she had been hired and in which she had more expertise than any of her coworkers to males unqualified for such tasks, withheld training, computer equipment, technical access and information that was necessary for her to do her job and that was freely given to plaintiff's male coworkers and denigrated her to coworkers and to other management within the Department of Wildlife.  In place of the highly skilled job for which plaintiff had been hired, Tom Owens substituted tasks at a much lower skill level, which had formerly done by employees in such gender-segregated positions as data entry operator and secretary.  Such tasks included cleaning up computer libraries for male managers and coworkers and producing documentation of existing computer systems for male coworkers. None of plaintiff's male coworkers, whose skill levels and experience in SAS, SQL and database programming were far less than plaintiff's, were ever asked to perform like tasks for plaintff.  Mr. Owen's hostility towards plaintiff was based on his belief, shared throughout the department of Wildlife, that computer expertise properly belonged to men.  Tom Owens, Chris Ringo, Randy Kreuziger, Marvin Young and Dave Caudill, among others, consistently denigrated the expertise of women within the Information Services division, a subordinate division of the predominately female Management Services Division.  Tom Owens exhibited special hostility towards plaintiff when she had completed difficult assignments or had solved programming problems Mr.

1  Owens and plaintiff's two male coworkers, Randy Kreuziger and Howard
2  Ferguson, had been unable to solve.
3      When plaintiff sought redress for these wrongs through department
4  channels and according to merit system rules, Penny Cusick, a personnel
5  officer with the department, actively collaborated with Tom Owens in trying
6  to force plaintiff from her job and from the department. Ms. Cusick lied to
7  plaintiff from her very first contact, promising plaintiff confidentiality
8  she immediately breached, and actively collaborated with Tom Owens in
9  creating a hostile and punitive environment for plaintiff. Ms. Cusick, under
10 the guise of a caring mediator who "was there for" plaintiff, attended a
11 first meeting that she had strongly urged upon plaintiff, between plaintiff
12 and Tom Owens, and then lied under oath a year later concerning the nature
13 and substance of this meeting  Ms. Cusick continued to attend meetings
14 between Tom Owens and plaintiff, over plaintiff's objections and contrary to
15 Merit System Rules, solely in order to provide perjured collaborative
16 testimony for Mr. Owens. Ms. Cusick, who has since been promoted to manager
17 of her department, continued throughout plaintiff's four years with the
18 agency to actively engage in and encourage retaliation against the plaintiff.
19     Plaintiff sought redress from Department of Wildlife management and
20 according to Merit System Rules beginning in 1994. Tom Owens responded to
21 plaintiff's concerns about her job assignments and lack of necessary computer
22 equipment and training by writing a "special" performance evaluation that
23 consisted chiefly of false statements about plaintiff and attacks on her
24 character and mental health and contained an unjustified warning of
25 disciplinary action. Contrary to Merit System Rules and department policy,
   Mr. Owens's supervisors refused plaintiff's request to review this

evaluation. In retaliation, Jim Eby assigned plaintiff to the supervisor of a Game biologist, Jim Rieck  With the exception of the male biologist to whom Mr. Owens had transferred many of plaintiff's SAS and data base assignments, Mr Rieck had no supervisory experience. His lack of computer expertise was known at that time to have caused many problems, such as the publication of invalid animal counts in departmental publications, the necessity of rerunning the 1993 permit drawings due to his having omitted the computer run assigning tag numbers to permits, and causing the failure of plaintiff's first project for regional field personnel due to his erroneous analysis of requirements  These problems were known to Department of Wildlife management personnel, including Dave Brittell and Jim Eby, when plaintiff was assigned to Jim Rieck's supervision. Mr. Rieck was also known to have strongly marked stereotypical views towards women. He frequently referred to women as "bubbly blondes" or "brunettes", made fun of a male employee because he had been hired for data entry and told plaintiff that he thought that women invited the violence done to them by men. Prior to plaintiff's transfer to Mr. Rieck's supervision, however, Mr. Rieck regularly acknowledged the errors he made. He was also initially supportive of plaintiff, acknowledged that plaintiff should have been assigned more SAS and database work and wrote a strongly worded memo to Ms. Cusick's division supporting plaintiff's request for the very minimal requirement of the signed form necessary for her to take classes at a local community college. Following a weekend during which he and Tom Owens helped build Howard Ferguson's house, however, Mr. Rieck reversed himself and withdrew the assignment of the SAS project, a cougar count, that he had given plaintiff

RESPONSE TO SUMMARY JUDGEMENT MOTION    4        KATHLEEN HOUSE. PRO SE

1  the previous Friday.  Mr. Rieck continued to make serious errors in data
2  analysis  one such example was his mistaken analysis of Cathy Drew's
3  accounting application, which was based on his erroneous assumption of
4  a duplication of data entry functions.  Even after this mistake was made
5  clear to him, he insisted that plaintiff divert her time from critical
6  projects within the Game division to develop the accounting application
7  because it was "slow".

8         Plaintiff continued to be forced into gender-stereotyped support roles
9  and into working for gender segregated divisions within the Department of
10 Fish and Wildlife.  The two major tasks Jim Rieck gave plaintiff were the
11 above assignment for the predominately female accounting department, and the
12 conversion of obsolete IBM Game libraries to a new operating system, a
13 project under the supervision of the predominately female Management Services
14 division.  Chris Ringo's attitude towards plaintiff changed sharply after he
15 ordered her to, and then himself, altered accounting numbers on plaintiff's
16 timesheets to charge time illegally to the Pitmann-Robertson account and
17 plaintiff reported this to the Department of Interior auditor who questioned
18 plaintiff on those expenditures.  The fact that plaintiff's private notes and
19 email were made available to him was also probably responsible for the
20 extreme change of attitude towards and willingness to lie about plaintiff
21 shown in his depositions.  Among other examples, he endorsed management's
22 account of the way in which training and equipment were requested by and
23 authorized for employees, which he knew to be false, falsely stated in a memo
24 that plaintiff never saw until discovery, that plaintiff had failed to back
25 up her hard drive, falsely stated that working backup software was available

to plaintiff at the time her computer crashed and falsely stated that plaintiff had never completed a training request form. He had told plaintiff to do so as part of the usual procedure, which was to direct the employee to fill out a request form after training had been approved by the supervisor. The fact that plaintiff did receive Powerbuilder training close to the end of her employment with the department shows that she did fill out a training request form. Training would not have been authorized without such a request and Chris Ringo knew that. He required last minute changes to the mailing label program and used that in depositions as a reason plaintiff was denied Powerbuilder training and Sybase assignments

    The only option offered plaintiff after her computer position was eliminated by Dave Brittell, Jim Eby and Penny Cusick was a position in the licensing department selling licenses across the counter and performing data entry. At the time of plaintiff's RIF, the department had hired an outside consultant, who was paid at consultant's rates, to write applications for the Game division in Powerbuilder and Sybase; Tom Owens had hired Jim Rieck to work for him as a programmer. A 1996 Department of Interior audit had listed the lack of accurate tracking of revenue as a serious problem that needed to be corrected; the division's response to that was there were insufficient personnel at that time to develop the new Sybase system. The $27 million dollar shortfall discovered in 1997 was attributed to the failure to timely implement a revenue tracking database on the Sybase server. Plaintiff had demonstrated her mastery of SAS, Sybase and Unix in the very short time she was allowed Powerbuilder and Sybase access. This was at the time the unskilled position in licensing was alleged to be the only one available to her. For several years after plaintiff's position was eliminated, and as far

as plaintiff knows, up to the present time, the department continued to hire computer consultants, from Sterling Software in Olympia and Professional Data Exchange, in Seattle, among others, to perform duties identical to those of plaintiff's position. These consultants were paid from $45 to $85 an hour by their companies; their actual cost to the department was much higher.

Plaintiff's supervisors' open retaliation against plaintiff encouraged a hostile environment on the part of plaintiff's coworkers  Randy Kreuziger participated in email correspondence, without plaintiff's knowledge, that falsely reported events to plaintiffs supervisors.  Plaintiff had no knowledge of this correspondence or the charges Mr. Kreuziger had made against her until this sole piece of email was given to her in discovery. However, Mr Kreuziger's attitude towards plaintiff was evident in his increasingly uncooperative behavior to plaintiff and in his refusals to provide plaintiff with the PC and LAN support that was part of his position duties.  Penny Cusick's and Jim Rieck's encouragement of Howard Fergeson's fabrication of incidents concerning plaintiff also created an extremely hostile environment.  Both men were given carte blanche to treat plaintiff however they wished   In one egregious incident in 1995, Howard Ferguson falsely accused plaintiff of "acting funny", then demanded that she go into a conference room with him.  He then proceeded to yell at plaintiff for 15 minutes.  Plaintiff's supervisor, Jim Rieck, admitted to plaintiff that he had not heard the actual discussion, but still reprimanded plaintiff  George Tsukomoto, Jim Rieck's supervisor, refused to review the incident with plaintiff.  Penny Cusick admitted in a deposition taken in 1998 that she did not discuss any of Howard Ferguson's accusations with plaintiff, yet she used

RESPONSE TO SUMMARY JUDGEMENT MOTION   7        KATHLEEN HOUSE, PRO SE

Mr. Ferguson's fabricated report of an incident alleged to have occurred in 1995 as support for Tom Owens's retaliatory 1994 evaluation of plaintiff. She encouraged Mr. Ferguson to keep a secret log of fabricated incidents. Plaintiff's private email and notes were taken from her hard drive after it was removed from her machine in the upgrade she was given in 1996; comments and statements made by Randy Kreuziger and Tom Owens indicate they had been given access to plaintiff's email and notes.  One of the most pleasant and cooperative of plaintiff's coworkers, Steve Pozzanghera, was told by plaintiff's supervisor, Jim Rieck, to write up one of the few incidents he was upset by plaintiff. Neither Mr. Pozzanghera nor Mr. Rieck discussed this incident with plaintiff, she was given no chance to explain that Dave Ware and Jim Eby had spent a large part of the preceeding hour at a division pot luck making fun of plaintff's having to write requests for services given as a matter of course to plaintiff's male coworkers.  A careful reading of Mr Pozzanghera's statement would also show how that his perception of plaintiff's behavior was inaccurate  changes in facial color and voice are physical signs of stress and cannot be reasonably described as "assault"; Mr  Ferguson's forcing plaintiff into a small conference and yelling at her for 15 minutes would more accurately be defined this way.  In contrast, Plaintiff had no recourse at all when coworkers chose to take out their frustrations on her:  exhibits include examples of the way in which plaintiff's complaints to upper management were dismissed.

    Other retaliatory acts include the reinvestigation of a complaint against a coworker, Dave Caudell, resolved in plaintiff's favor prior to her filing a Title VII complaint naming that coworker.  Plaintiff crossed out

RESPONSE TO SUMMARY JUDGEMENT MOTION    8        KATHLEEN HOUSE, PRO SE

that section of her complaint specifically because she felt that Steve Penland had done everything he could to resolve her complaint and did not realize that the EEOC would leave the name visible in the copy of the complaint given the department.

## AUTHORITIES AND POINTS OF LAW

Summary judgment is not appropriate where evidence exists that the employer lied. In Reeves v. Sanderson Plumbing Products (2000) 530 U.S. 133, 120 S Ct. 2097, 147 L.Ed.2d 105, a unanimous Supreme Court ruled that

> "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. See id., at 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. See, e.g., Wright v. West, 505 U.S. 277, 296. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr Corp v. Waters, 438 U.S. 567, 577."

Plaintiff's supervisors falsely stated under oath to the Equal Employment Opportunity Commission that plaintiff had received a new computer in October of 1996  After plaintiff was able to prove this false, Mr. Eby changed his statement to plaintiff having received a computer upgrade, and Sandra Turner "lost" the page containing this perjured testimony.  Falsified documents were also submitted to the EEOC and to the district court in an attempt to prove a false statement of the date on which plaintiff received Paradox 5.0.  These are only two example of many false statements existing in the affidavits supporting defendants' Motion for Summary Judgment in the initial discrimination case, C97-5708.  Plaintiff gave direct evidence of this in her response to that motion

The principles of collateral estoppel and res judicata do not apply to

unreviewed decisions by state administrative agencies in Title VII cases.

The Supreme court has held unanimously:

> "Since it is settled that decisions by the EEOC do not preclude a trial de novo in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts. [citations omitted]" (KREMER v. CHEMICAL CONSTRUCTION CORP., 456 U.S. 461 (1982)

The Personnel Appeals Board serves primarily to rubber-stamp employment decisions made by managers within state agencies. It is neither a judicial nor a fact-finding body. Two of the most fundamental principles of law, the rules of evidence and the publication of proceedings, are not used by the board. Plaintiff has attached documents showing that the board does not provide or keep transcripts of its proceedings  Testimony inadmissable in a judicial forum is specifically allowed in Board hearings by WAC 358-30-030 (2), which states in relevant part:

> The hearing shall be informal. Technical rules of evidence shall not apply to the proceedings, except for the rules of privilege recognized by law.

In both hearings, the Board gave full evidentiary weight to speculative and hearsay testimony by Penny Cusick  The only testimony concerning the actions of Tom Owens and Howard Ferguson in plaintiff's appeal of the Tom Owens's 1994 retaliatory evaluation came from this one source. The same transgression of this most elementary of the rules of evidence occurred throughout the 1998 RIF appeals hearing  Mr. Brittell would not testify to personal knowledge of the memoranda ascribed to him, evidently for fear of perjury.  The Board nevertheless accepted as evidence Mr Brittell's speculations as to what his probable actions would have been  Ms. Cusick's

RESPONSE TO SUMMARY JUDGEMENT MOTION    10    KATHLEEN HOUSE, PRO SE

1  testimony followed this same pattern: plaintiff repeatedly pointed out to
2  the Board during the RIF appeal that Ms. Cusick's testimony was speculative
3  rather than factual, and that she testified to events of which she had no
4  personal knowledge  The Board affirmed during both hearings that speculative
5  and hearsay testimony were acceptable.  In addition, the Board simply ignored
6  plaintiff's evidence and the requirements of WAC 358-30-170, which states in
7  relevant part

> WAC 358-30-170 Burden of proof.  At any hearing on appeal from a layoff
> or reduction in force ... the appointing authority shall have the
> burden of supporting the charges upon which the action was initiated.

10  In addition, bias existed in that the chief hearings examiner, Mr. Jorgensen,
11  had been a member of the union that had refused to provide representation
12  to which plaintiff was entitled.  His comments during the hearing show that
13  he was aware of the efforts plaintiff had made to obtain that representation.
14         In addition, the State may not use a RIF to remove a particular
15  employee. See Washington v. Garrett, 10 F 3d. 1421, 1429.

> "A reduction in force may not be used as a disguise for an adverse
> action to remove or demote a particular employee...the bureaucratic
> version of the old shell game, in which the victim ends up with no job
> because the duties have been slipped under a new shell (position) but
> nothing of substance has changed, may alone be enough to raise an
> inference of improper motivation - at least when combined with other
> circumstances such as those present here"

20  Plaintiff's experience and defendants' own statements show a history of
21  animosity towards plaintiff by agency management.
22         For these reasons, plaintiff respectfully requests that defendants'
23  motion for summary judgment be denied.
24                                        Dated this 14th day of July, 2002

*[signature]*
KATHLEEN HOUSE, PRO SE

Statement of Service

I certify that I have served a copy of the attached Request for Extension of Time/Interim Response on defendant's attorney by leaving same at defendant's office at 905 Plum Street, SE, Building 3, Olympia, Washington or by mailing same via first-class mail to 905 Plum Street, SE, Building 3, P.O Box 40145, Olympia, Washington  98504-0145 on July 19, 2002

*[signature]*
Kathleen M. House

# ATTACHMENTS

# NOT SCANNED